IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CHRISTINE COX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:23-cv-766 (RDA/WEF) |
| | ) | |
| RED HAT, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Red Hat, Inc.'s ("Defendant Red Hat" or "Red Hat") and Bruce Marcey's ("Defendant Marcey" or "Marcey") (collectively, "Defendants") Motions to Dismiss the Amended Complaint for Failure to State a Claim ("Motions to Dismiss"). Dkt. Nos. 15; 17. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motions to Dismiss together with Plaintiff Christine Cox's ("Plaintiff") Amended Complaint (Dkt. 12), Defendants' Memoranda in Support (Dkt. Nos. 16; 18), Plaintiff's Oppositions (Dkt. Nos. 23; 24), and Defendants' Replies (Dkt. Nos. 25; 26), this Court GRANTS Defendant Red Hat's Motion to Dismiss (Dkt. 15) and GRANTS-IN-PART and DENIES-IN-PART Defendant Marcey's Motion to Dismiss (Dkt. 17) for the reasons that follow.

# I. BACKGROUND

## A. Factual Background[1]

Plaintiff Christine Cox began working at Red Hat in March 2021 as the Senior Director of Civilian/National Security Sales. Dkt. 12 (Amended Complaint) ¶ 18. At all times relevant to the instant civil action, Defendant Marcey was an Account Executive at Red Hat. *Id.* at ¶ 9. Prior to Plaintiff's employment at Red Hat, "TWS" had worked with Red Hat in order to secure a multimillion-dollar contract with Veterans Affairs (the "VA"). *Id.* at ¶ 48. The contract included a base year and two options to extend and involved TWS, Red Hat, and the distributors Carahsoft and DLT Solutions. *Id.* Shortly before the deal was set to close, Marcey informed TWS about what Red Hat's margin would need to be and told TWS that he would need to include "his guy" John Rucker, a contractor, in the deal. *Id.* Plaintiff alleges that Marcey refused to provide a "scope of work" for Rucker and falsely represented that Red Hat did not have "market funds to pay consultants and was using . . . Rucker." *Id.* TWS agreed to Marcey's terms. *Id.* When the time came to renew the contract with the VA in January 2022, TWS attempted to negotiate with Red Hat once again. *Id.* This time, however, TWS required a "scope of work" for Rucker as a condition for TWS' work on the contract. Marcey again refused to provide that information, causing a breakdown in negotiations. *Id.* Marcey then replaced TWS on the VA contract with another company, V3Gate, where he had a family member, without considering bids for replacement partners. *Id.*

---

[1] For purposes of considering Defendants' Motions to Dismiss, the Court accepts all facts contained within Plaintiff's Amended Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

In January 2022, Plaintiff learned from executives at TWS that Marcey may have been receiving kickbacks on the VA contract through Rucker. *Id.* ¶ 49. Based on the information that she received, Plaintiff believed that Marcey had been submitting false invoices for work that Rucker was purportedly doing and that Rucker had been sending Marcey some of the money that the VA had awarded for the contract. *Id.*

After receiving this information, Plaintiff questioned Marcey regarding the alleged kickback scheme, and Marcey responded that she should "mind [her] fucking business." *Id.* ¶ 50. Plaintiff later met with Red Hat's legal department to discuss the ethics and legality of Marcey removing TWS as a partner, Marcey's alleged scheme with Rucker, and the need for Federal Acquisition Regulation System ("FAR") compliance. *Id.*

Plaintiff asserts that, after she reported her concerns to Red Hat's Legal Department in March 2022, Marcey embarked on a continuous, months-long campaign of disparaging her. *Id.* ¶ 51. Plaintiff alleges that Marcey made the following seven defamatory statements as part of this effort:

- In January 2022, Marcey called Plaintiff a "slut" during a meeting with the VA/Health and Human Services ("HHS") team. *Id.* ¶¶ 52, 91.

- At a conference in Orlando, Florida on March 16, 2022, Marcey called Plaintiff a "whore" and a "slut," and said that "she won't be around long." *Id.* ¶¶ 54, 91.

- At a Capitals game in February or March 2022, Skip Leisgang, a "Proofpoint partner," told Plaintiff that Marcey was saying that he wanted to "off" Plaintiff's family and had proof that she had "screwed Greg Feldman," the CEO of TWS. *Id.* ¶¶ 55, 91.

- In March 2022, Marcey told Mike McCalip of Carahsoft that Plaintiff "slept with Greg Feldman." *Id.* ¶¶ 58, 91.

- At an Amazon AWS conference on April 20, 2022, Marcey told John Meier of TWS and Keith Foley that Plaintiff had "slept her way to the top," that she had "slept with Greg Feldman," and that she was a "whore." *Id.* ¶¶ 67, 91.

- Marcey later told partners and vendors within the public sector community including Kathleen O'Flaherty of Dinatrace, "Don't work with her or talk to her as a Red Hat employee as I am getting her fired and she won't be around long" and "[Plaintiff] slept [her] way to the top." *Id.* ¶ 91. O'Flaherty then told other partners and vendors within the public sector community that "[Plaintiff] slept with Greg Feldman which is why she wants TWS in the VA deal." *Id.*

- On July 27, 2022, when Marcey and John Meier of TWS were still attempting to negotiate a deal to renew the VA contract, Marcey told Meier over the phone that Plaintiff was a "fucking whore," had "slept with Greg Feldman," had "slept her way to the top," and to "get that fucking cunt out of my business." *Id.* At around that same time, Marcey also told Meier that Plaintiff was "sleeping with Jim Boykin" of "Fed Civ Partners." *Id.*

On March 29, 2022, Plaintiff went to Red Hat's Legal Department to express her concerns about Marcey spreading rumors about her. *Id.* ¶ 57. Plaintiff also reported the rumors to Joe Sangiuliano, Red Hat's Vice President of Business Development, who responded by warning Plaintiff to "be careful." *Id.* ¶ 62. In April 2022, Plaintiff reported Sangiuliano's statement along with the rumors that Marcey had been spreading about her to Red Hat. *Id.* ¶ 59. At some point, Rick Miller, Senior Director of "Civ 2," told Plaintiff not to "push [Marcey]'s buttons" and to "stay in [her] swim lane." *Id.* at ¶ 60. Plaintiff replied that the "PSE (public sector enterprises)" "swim lane" included incumbent partners being removed from longstanding and profitable business transactions. *Id.* In response, Rick Miller told Plaintiff that she was "playing with fire" and to "stand down." *Id.* Feldman also spoke to Mike Miller, the VP for Enterprise Sales for Red Hat, on multiple occasions in an effort to stop Marcey from continuing to spread rumors about Plaintiff and told Mike Miller that HR needed to take action. *Id.* ¶ 72.

Plaintiff alleges that, despite alerts from her, Feldman, and others that the rumors Marcey was spreading were inappropriate, false, and damaging, Red Hat took no action against Marcey. *Id.* ¶ 73. Indeed, Plaintiff alleges that, at a networking event on March 1, 2023, Mike Miller quoted Marcey to her face, stating "You're the one who 'slept her way to the top.'" *Id.* ¶ 84. Plaintiff

further asserts that, later, in a meeting with HR in July 2022, Red Hat retaliated against her by subjecting her to a degrading and humiliating "interrogation" about her relationships with men in the industry. *Id.* ¶ 77. Plaintiff alleges that she then interviewed for a position at Red Hat for which she was qualified in late September or early October and was terminated shortly thereafter in early December. *Id.* ¶¶ 80-82. Although she was told that her position was being eliminated, Plaintiff asserts that she was replaced by a new male hire. *Id.* ¶ 85.

Based on these allegations, Plaintiff's Amended Complaint brings a claim for defamation (Count I) against Defendants Red Hat and Marcey and whistleblower retaliation claims under Virginia's Whistleblower Statute (Count II) and the False Claims Act ("FCA") (Count III) against Defendant Red Hat. Dkt. 12 ¶¶ 88-148.

### B. Procedural Background

Plaintiff initially filed suit against Defendants Red Hat and Marcey in the Circuit Court of Fairfax County, Virginia on May 11, 2023. Dkt. 1 (Notice of Removal) ¶ 1. Defendants then removed the instant action to this Court on June 13, 2023. Dkt. 1. On June 20, 2023, Defendant Red Hat filed its First Motion to Dismiss, Dkt. 4, and on June 30, 2023, Defendant Marcey filed his First Motion to Dismiss, Dkt. 8. Plaintiff subsequently filed an Amended Complaint against Defendants Red Hat and Marcey on July 10, 2023, Dkt. 12, and this Court then denied Defendants' First Motions to Dismiss as moot on July 18, 2023, Dkt. 14. Thereafter, on July 24, 2023, Defendants filed their respective Motions to Dismiss the Amended Complaint, Dkt. Nos. 15; 17, along with Memoranda in Support, Dkt. Nos. 16; 18. On August 1, 2023, the parties filed a Consent Motion for Extension of Time to File Response/Reply ("Consent Motion for Extension"), Dkt. 21, which this Court granted on August 3, 2023, Dkt. 22. Plaintiff then filed Oppositions to

Defendants' Motions to Dismiss on August 11, 2023, Dkt. Nos. 23; 24, and Defendants filed Replies in support of their respective Motions to Dismiss on August 21, 2023, Dkt. Nos. 25; 26.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint. *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal of the motion is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff],'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in

evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).

## III. ANALYSIS

Defendants Red Hat and Marcey move the Court to dismiss the defamation claim brought against them on several grounds. At the outset, they contend that the majority of the alleged defamatory statements made by Marcey are barred by Virginia's one-year statute of limitations. Dkt. Nos. 16 at 1; 18 at 1. Defendants further assert that the remaining alleged defamatory statements are not actionable because they either lack the requisite specificity or are constitutionally protected opinions or rhetorical hyperbole. Defendants also claim that the remaining statements are protected by a qualified privilege for which Plaintiff fails to plead actual malice. Dkt. Nos. 16 at 1; 18 at 1-2. Defendant Red Hat further argues that Plaintiff's theory that Red Hat ratified Marcey's alleged defamatory statements fails as a matter of law. Dkt. 16 at 1.

Defendant Red Hat additionally urges this Court to dismiss the whistleblower retaliation claims brought against it for two separate reasons. First, Defendant Red Hat contends that Plaintiff has not alleged any conduct that reasonably could be characterized as protected activity under either the FCA or the Virginia Whistleblower Statute. *Id.* at 2. Second, Defendant Red Hat asserts that Plaintiff has not alleged any facts plausibly showing a causal connection between any protected activity and adverse employment actions. *Id.*

The Court will address each argument in turn.

### A. The Defamation Claim

#### 1. Whether Any of the Alleged Defamatory Statements Are Time-Barred

As a threshold matter, the Court considers whether any of the alleged defamatory statements are barred by the applicable statute of limitations. "In Virginia, there is a one-year

statute of limitations for defamation claims which begins to run from the 'date of publication.'"[2] *Shomo v. Napa Mgmt. Servs. Corp.*, No. 122CV989LMBJFA, 2022 WL 17477066, at \*5 (E.D. Va. Dec. 6, 2022) (quoting *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 914 (E.D. Va. 2004)); *see also* Va. Code § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues."). In the instant case, Plaintiff filed her initial Complaint on May 11, 2023, and so any alleged defamatory statements made before May 11, 2022, are barred by the statute of limitations.

In an effort to avoid these circumstances, Plaintiff first argues that the alleged defamatory statements made prior to May 11, 2022 amount to a continuous tort, thereby extending the statute of limitations to the final defamatory statement. Dkt. 23 at 12. Plaintiff is correct that, "under a continuing tort theory, the statute of limitations does not begin to run until the tortious conduct ceases." *Lewis v. Gupta*, 54 F. Supp. 2d 611, 616 (E.D. Va. 1999) (citing *Williams v. Norfolk and Western Railway Co.*, 530 F.2d 539, 542 (4th Cir.1975)). However, courts within this District have uniformly held that, because each publication of a defamatory statement constitutes a separate tort, the continuing violation theory does not apply to defamation claims. *See e.g.*, *Lewis*, 54 F. Supp. 2d at 616 ("[R]epeated defamations do not constitute a continuing tort; rather, . . . each separate defamatory statement itself constitutes a separate and distinct cause of action."); *Kronberg v. LaRouche*, No. 1:09CV947 AJT/TRJ, 2010 WL 1443898, at \*10 n.7 (E.D. Va. Apr. 9, 2010) (same). Accordingly, Plaintiff cannot rely on the "continuing tort" theory to avoid Defendants' statute of limitations defense.

---

[2] "Publication means the defendant communicated the statement to a third party." *Shomo v. Napa Mgmt. Servs. Corp.*, No. 122CV989LMBJFA, 2022 WL 17477066, at \*5 (E.D. Va. Dec. 6, 2022) (internal quotation omitted).

Plaintiff also invokes two tolling agreements in an attempt to save her defamation claim against Defendant Red Hat based on the April 20, 2022 statement. Dkt. 23 at 13-14. On April 7, 2023, Plaintiff and Defendant Red Hat entered into a tolling agreement, which provided that the statute of limitations would be tolled through May 1, 2023. Dkt. 23-1 at 2. On April 18, 2023, Plaintiff and Defendant Red Hat then signed a second tolling agreement, which extended the tolling period through May 9, 2023. Dkt. 23-2 at 2. Plaintiff thus argues that, pursuant to the tolling agreements, Defendant Red Hat has waived any statute of limitations defense as to any statements made after April 9, 2023. Dkt. 23 at 13.

Importantly, however, Defendant Marcey was not a party to either tolling agreement, and so his underlying April 20, 2022 statement has been extinguished by the one-year statute of limitations. Plaintiff here has not provided any legal support for the proposition that she can bring a defamation claim against Defendant Red Hat under a theory of ratification or a vicarious liability theory of *respondeat superior* when the underlying defamation claim against Marcey is not actionable. In fact, a district court in a similar context has held precisely the opposite. *See JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC*, No. 3:19-CV-00469, 2023 WL 3590668, at *9 (M.D. Tenn. May 22, 2023) (finding that "[t]he tolling agreement does not apply because the relevant claims against [the individual co-defendant] were extinguished by the statute of limitations before [the p]laintiffs filed the corresponding vicarious liability claims against [the corporate defendant]" and dismissing two intentional tort claims against the corporate defendant as time-barred). As such, this Court concludes that the tolling agreements do not salvage a defamation claim against Defendant Red Hat based on Defendant Marcey's extinguished April 20,

2022 statement. Accordingly, the Court will dismiss any defamation claim based on the first five statements Plaintiff alleges.[3]

2. Whether Plaintiff has Plausibly Pleaded a Defamation Claim Based on Either of the Remaining Statements

To survive a motion to dismiss a defamation claim, a plaintiff in Virginia must plausibly plead the following elements: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018) (citing *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015)). The Court first addresses whether Plaintiff has pleaded any actionable statements before turning to the publication and intent elements.

a. Actionable Statement

As discussed *supra*, the only two statements that are not time-barred are the sixth and seventh statements that Plaintiff alleges in her Amended Complaint:

- Marcey later told partners and vendors within the public sector community including Kathleen O'Flaherty of Dinatrace, "Don't work with her or talk to her as a Red Hat employee as I am getting her fired and she won't be around long" and "[Plaintiff] slept [her] way to the top." Dkt. 12 ¶ 91. O'Flaherty then told other partners and vendors within the public sector community that "[Plaintiff] slept with Greg Feldman which is why she wants TWS in the VA deal." *Id.*

- On July 27, 2022, when Marcey and John Meier of TWS were still attempting to negotiate a deal to renew the VA contract, Marcey told Meier over the phone that Plaintiff was a "fucking whore," had "slept with Greg Feldman," had "slept her way to the top," and to "get that fucking cunt out of my business." *Id.* At around that same time, Marcey also told Meier that Plaintiff was "sleeping with Jim Boykin" of "Fed Civ Partners." *Id.*

---

[3] Defendant Marcey also appears to argue that the sixth alleged defamatory statement is time-barred. Dkt. 18 at 2-3 (asserting that only the seventh statement was made within the one-year statute of limitations). However, it is not clear from the face of the Amended Complaint that the sixth statement was made prior to May 11, 2022. Plaintiff merely alleges that the sixth statement was made some time "later" than April 20, 2022. Dkt. 12 ¶¶ 67, 68. The Court thus declines to find that this sixth statement is time-barred. Regardless, as explained *infra*, this sixth statement is not actionable for other reasons.

Defendants first argue that the sixth alleged statement cannot support a defamation claim because it lacks the requisite specificity. In analyzing a claim for defamation under Virginia law, "a court must decide . . . whether a statement is reasonably capable of defamatory meaning before allowing the matter to be presented to a finder of fact." *Schaecher v. Bouffault*, 772 S.E.2d 589, 595 (Va. 2015) (citing *Perk v. Vector Res. Group, Ltd.*, 485 S.E.2d 140, 143-44 (Va. 1997)). Importantly, a "court cannot 'perform this gatekeeping function,'" *Shafer v. Carter*, No. 5:21-CV-00014, 2023 WL 5610194, at *6 (W.D. Va. Aug. 30, 2023), *report and recommendation adopted in part, rejected in part on other grounds*, No. 5:21-CV-00014, 2023 WL 6149268 (W.D. Va. Sept. 20, 2023) (quoting *Schaecher*, 772 S.E.2d at 595), "unless the plaintiff's complaint alleges facts showing 'a speaker, the substance of the statement, when the statement was made, and why the statement is defamatory,'" *id.* (quoting *Skillstorm, Inc. v. Elec. Data Sys.*, 666 F. Supp. 2d 610, 620 (E.D. Va. 2009)).

Here, Plaintiff fails to adequately identify when the sixth alleged defamatory statement was made. She merely alleges that the sixth statement was made some time "later" than the fifth statement, which was made on April 20, 2022. Dkt. 12 ¶ 91. Furthermore, the Amended Complaint does not specify who the "partners and vendors" Marcey or O'Flaherty spread the alleged rumors to. *See McCray v. Ardelle Assocs. Inc.*, No. 4:14CVL58, 2015 WL 3886318, at *6 (E.D. Va. June 23, 2015) (finding that an allegation that statements were made "to third parties" without identifying to whom in particular the statements were made was insufficient to state a defamation claim). Accordingly, the Court concludes that the sixth statement is bereft of the factual support necessary to plausibly state a claim for defamation, and any defamation claim based on the sixth alleged statement will be dismissed for that reason.

Defendants next contend that any defamation claim based on the seventh statement fails because the rumors that Marcey allegedly spread about Plaintiff merely amount to rhetorical hyperbole or opinion and thus cannot be considered actionable defamation.  Dkt. Nos. 16 at 15-16; 18 at 9-10.  To be actionable, statements must be "both false and defamatory."  *Couric*, 910 F.3d at 783.  Because statements must be false to be actionable, it follows that statements that are not factual assertions cannot be the basis for defamation liability.  The typical example of this is an opinion.  Simply put: "[s]tatements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false."  *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 509 (E.D. Va. 2016) (quoting *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 40 (2006)).  In determining whether a statement is a constitutionally protected opinion, the Fourth Circuit has instructed courts to "assess how an objective, reasonable reader would understand" a statement, "emphasiz[ing] the verifiability of the statement," since "a statement not subject to objective verification is not likely to assert actual facts."  *Snyder v. Phelps*, 580 F.3d 206, 218-19 (4th Cir. 2009) *aff'd* 562 U.S. 443 (2011).  Generally, if there is a "provably false connotation" in an opinion, it is "thus capable of being true or false" and the opinion may be actionable.  *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 660 (E.D. Va. 2015) (cleaned up).  Similarly, if an opinion is "laden with factual content and the underlying facts are allegedly false[,]" it may be actionable.  *Andrews v. Va. Union Univ.*, No. 3:7-cv-447, 2007 WL 4143080, at *8 (E.D. Va. Nov. 19, 2007).  The line between actionable and non-actionable opinion is one this Court must draw after considering each "statement as a whole."  *Anderson v. Sch. Bd. of Gloucester Cnty., Va.*, No. 3:18-cv-745, 2020 WL 2832475, at *37 (E.D. Va. May 29, 2020).

Read in context, all but one portion of the seventh statement alleged here is actionable. First, Marcey's comments to Meier that Plaintiff "slept with Greg Feldman" and was "sleeping with Jim Boykin" are clearly factual statements that can be shown to be either true or false. Dkt. 12 ¶ 91; *see also Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 184 (4th Cir. 1998) (noting that statements are actionable if they "can be reasonably interpreted to declare or imply untrue facts"). Furthermore, Marcey's statements that Plaintiff is a "whore" and that she had "slept her way to the top" are actionable because those words imply the underlying purported facts that Plaintiff slept with numerous men in her industry. Dkt. 12 ¶ 91; *see also "Whore*," Merriam-Webster Dictionary Online, https://perma.cc/FR4C-C6XW (last visited November 9, 2023) (defining "whore" as "a promiscuous . . . woman").[4] By contrast, Marcey calling Plaintiff a "cunt," Dkt. 12 ¶ 91, cannot "reasonably be understood . . . to convey a false representation of fact." *Crawford v. United Steel Workers, AFL–CIO*, 335 S.E.2d 828, 839 (Va. 1985), *cert. denied*, 475 U.S. 1095 (1986). Marcey's use of this epithet merely evinces his general animosity towards Plaintiff and thus does not amount to an actionable statement. *See* "*Cunt*," Dictionary.com, https://perma.cc/APR5-XPWB (last visited November 9, 2023) (defining a "cunt" as "a contemptuous term used to refer to a woman"); *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998) (explaining that the use of language that is "insulting, offensive, or otherwise inappropriate, but constitutes no more than rhetorical hyperbole" cannot support a defamation claim).

---

[4] Courts applying the defamation laws of other states have likewise held that referring to a woman as a "whore" or "prostitute" can be defamatory. *See, e.g.*, *Hawks v. Seery*, No. CV-21-00092-PHX-DGC, 2023 WL 5206135, at *8 (D. Ariz. Aug. 14, 2023) (collecting cases); *Yang v. Lin*, No. CV198534ESESK, 2022 WL 2389300, at *9 (D.N.J. July 1, 2022).

In sum, reading the Amended Complaint in the light most favorable to Plaintiff, the only remaining actionable allegations are the following portions of the seventh statement: Marcey telling Meier that Plaintiff had "slept with Greg Feldman," was "sleeping with Jim Boykin" of "Fed Civ Partners," is a "whore," and had "slept her way to the top." Dkt. 12 ¶ 91.

### b. Publication

The Court now turns to the question of whether Plaintiff has adequately pleaded the publication element of a defamation claim. Under Virginia law, publication requires that the alleged defamatory statement be made to a third party in a non-privileged context or, if made in a privileged context, be made with actual malice. *Shaheen v. WellPoint Companies, Inc.*, No. 3:11-CV-077, 2011 WL 5325668, at *4 (E.D. Va. Nov. 3, 2011), *aff'd*, 490 F. App'x 552 (4th Cir. 2012) (citations omitted). "The Virginia Supreme Court has advised that allegedly defamatory statements arising out of an employment relationship may be afforded a qualified privilege if the statement is made between persons on a subject in which they have an interest or duty." *Wynn v. Wachovia Bank, N.A.*, No. 3:09CV136, 2009 WL 1255464, at *3 (E.D. Va. May 6, 2009) (citing *Union of Needletrades, Indus. & Textile Employees AFL–CIO v. Jones*, 603 S .E.2d 920, 924 (Va. 2004)). Relevant here, Virginia courts have extended the qualified privilege to other third-party relationships where there is a duty, such as the relationship between contractors. *See Hugen v. New England Retail Exp., Inc.*, 99 F.3d 1130 (4th Cir. 1996) (affirming under Virginia law that a qualified privilege attached to communications between independent contractors about a potential theft because they "had a common pecuniary interest in preventing theft from [the client] and other []customers"). To be sure, "[w]hile the privilege applies broadly to statements with respect to "employment matters," it is not absolute and "is lost if defamatory statements are communicated

to third parties who have no duty or interest in the subject matter, even if those third parties are fellow employees." *Shaheen*, 2011 WL 5325668, at *4.

"Once a qualified privilege has attached to a communication, the plaintiff has the burden to prove that the privilege has been lost or abused" by alleging facts sufficient to show actual malice. *Cashion v. Smith*, 749 S.E.2d 526, 532 (Va. 2013) (citation omitted). Actual malice, "in turn, is 'behavior actuated by motives of personal spite, or ill-will . . . .'" *Echtenkamp v. Loudon Cnty. Pub. Sch.*, 263 F. Supp. 2d 1043, 1061-62 (E.D. Va. 2003) (quoting *Se. Tidewater Opportunity Project, Inc. v. Bade*, 435 S.E.2d 131, 132 (Va. 1993)). In other words, to defeat "the qualified privilege[, the] plaintiff must show that 'the communication was actuated by some sinister or corrupt motive such as hatred, revenge, personal spite, ill will, or desire to injure the plaintiff.'" *Id.* (quoting *Se. Tidewater Opportunity Project, Inc.*, 435 S.E.2d at 132).

Here, the Court finds that, at most, only one portion of the alleged seventh statement is subject to the qualified privilege. The Amended Complaint alleges that Marcey made the seventh statement to Meier, a TWS employee, when "attempting to negotiate a deal to renew the VA contract." Dkt. 12 ¶ 91. The fact that Red Hat and TWS were potential partners on the VA contract suggests that their employees might have had a legitimate interest in communicating about whether Plaintiff was advocating to keep TWS on the VA deal due to her intimate relationship with Feldman, TWS' CEO. Thus, for purposes of deciding the instant Motions to Dismiss, the Court assumes that the qualified privilege applies to Marcey's statement that Plaintiff "slept with Greg Feldman." Dkt. 12 ¶ 91. Whether Marcey and Meier had a legitimate interest in communicating about Plaintiff sleeping with Boykin of Fed Civ Partners is an even closer question, however. The Amended Complaint contains no information at all about Fed Civ Partners, and this Court declines to speculate as to what relevance Plaintiff's sexual relations with an employee of that company

may have had to Red Hat and TWS' contracting relationship.  Additionally, there was certainly no duty for Marcey to tell Meier that Plaintiff was a "fucking whore" and had "slept her way to the top."

Having found that the qualified privilege may apply to Marcey's statement that Plaintiff "slept with Greg Feldman," the Court next considers whether Plaintiff has shown by clear and convincing evidence that the statement was made with actual, common-law malice.  The Supreme Court of Virginia has instructed that a plaintiff sufficiently pleads malice where she alleges that the defendant is out to "get" her, is "intentionally orchestrat[ing her] discharge," *Oberbroeckling v. Lyle*, 362 S.E.2d 682, 686 (Va. 1987), or is "engaged in some sort of personal vendetta" against her, *Smalls v. Wright*, 399 S.E.2d 805, 808 (Va. 1991); *see also Farley v. Thalhimer*, 49 S.E. 644, 646 (Va. 1905) (advising that "strong and violent language . . . , disproportioned to the occasion, . . . may raise an inference of malice . . . .").  At bottom, "a plaintiff can survive a motion to dismiss by pleading facts showing some greater pattern of animus by the defendant."  *Hockycko v. Entrodyne Corp.*, No. CIV.A. 6:05CV00025, 2005 WL 3132320, at *5 (W.D. Va. Nov. 22, 2005).

Here, to the extent that any portion of the Seventh statement is privileged, Plaintiff has met her burden of showing that the privilege has been lost at this early stage of the litigation.  Plaintiff claims that Marcey engaged in a smear campaign against her in retaliation for her having questioned and reported him for his dealings with Rucker.  Dkt. 12 ¶¶ 48-51.  She specifically alleges that Marcey made false statements about her sexual relations with men in the industry to get her fired.  *See id.* ¶ 91 (alleging that Marcey told Red Hat's partners and vendors, "Don't work with [Plaintiff] or talk to her as a Red Hat employee as I am getting her fired and she won't be around long.").  Moreover, the vulgar language that Marcey used in referring to Plaintiff, *see id.* (alleging that Marcey called Plaintiff a "fucking cunt" and a "fucking whore"), evinces a motive

of personal spite and revenge for making up and spreading rumors about her. Accordingly, the Court finds that Plaintiff's allegations are sufficient to overcome the qualified privilege at this juncture.

### c. Intent

With respect to the non-privileged portions of the seventh alleged statement, Plaintiff need only make out that Marcey acted with the lower standard of negligence. *See Gazette, Inc. v. Harris*, 325 S.E.2d 713 (Va. 1985) (explaining that private figure plaintiffs must establish by a "preponderance of the evidence that the publication was false, and that the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based"). Here, as the Court explained *supra*, Plaintiff has alleged facts sufficient to establish not only negligence, but actual malice on Marcey's part. Accordingly, the Court finds that Plaintiff has adequately alleged the intent element of her defamation claim at the motion to dismiss stage.

### 3. Whether Defendant Red Hat Can Be Held Liable for Defendant Marcey's Alleged Defamatory Statements

The Court next considers whether Defendant Red Hat can be held responsible for Defendant Marcey's alleged defamatory statements. In her Amended Complaint, Plaintiff sets forth a theory of ratification based on the following allegations: (1) Red Hat "[f]ail[ed] to take action to put a stop to [Marcey's] statements" about her; (2) Red Hat "retained" Marcey and paid him on the VA transaction; (3) Red Hat's HR "interrogated" Plaintiff about her relationships with men in the industry; (4) Rick Miller failed to take action against Marcey and instead told Plaintiff to "be careful," to not "push [Marcey's] buttons," to "stand down," and that her team needed to "stay in [its] swim lane," and suggested that Plaintiff was "playing with fire"; (5) rather than

reprimanding Marcey, Sangiuliano warned Plaintiff to "be careful"; and (6) at a networking event, Mike Miller, quoting Marcey, told Plaintiff, "You're the one who 'slept her way to the top.'" Dkt. 12 ¶¶ 64, 84, 94, 97.

"Virginia courts typically find that ratification has occurred only where the employer has 'expressly' confirmed the conduct or acted affirmatively in response to it." *Meade v. Johnston Mem'l Hosp.*, No. 1:10-CV-00024, 2010 WL 3463639, at *6 (W.D. Va. Sept. 2, 2010) (citing *Tri-State Coach Corp. v. Walsh*, 49 S.E.2d 363, 368 (Va. 1948)). Put simply, inaction does not constitute ratification. Against this framework, Plaintiff's allegations, even when viewed in the light most favorable to her, do not plausibly show that Defendant Red Hat ratified Defendant Marcey's alleged defamatory statements.

To begin with, Plaintiff's allegation that Defendant Red Hat and its executives simply failed to take action in response to Marcey's conduct does not amount to ratification. *See Meyer v. Dominion Bank*, No. 113831., 1992 WL 884824, at *2 (Va. Cir. Ct. July 24, 1992) (finding that the defendant did not ratify fraud even though it refused to take any corrective action). Neither does Red Hat's continued employment of Marcey constitute ratification of Marcey's statements. *See Meade*, 2010 WL 3463639, at *7 ("The bare allegation that Parks was retained while Meade was terminated is likewise insufficient, without more, to show that JMH affirmatively and expressly adopted Parks' particular conduct, as required under Virginia law.").

Plaintiff's allegation that Red Hat's HR asked her questions about her relationships with men in the industry is likewise unavailing. In support of her theory of ratification, Plaintiff directs the Court's attention to *Thalhimer Brothers, Inc. v. Shaw*, 159 S.E. 87 (Va. 1931). There, the Supreme Court of Virginia concluded that the lower court correctly instructed the jury on ratification in a defamation case because the employer affirmatively "disseminated [the

accusation] to other employees" who were not part of the investigation. *Shaw*, 159 S.E. at 90. The instant case is readily distinguishable. Plaintiff here alleges only that Red Hat's HR asked her questions during the course of an investigation—not that HR spread Marcey's alleged defamatory statements about her to other employees. Dkt. 12 ¶ 97; *see also Van Vleck v. Sallyport Glob. Holdings, Inc.*, No. 1:19-CV-60, 2019 WL 2273845, at *3 (E.D. Va. May 28, 2019) (dismissing a plaintiff's defamation claim because "the statements" at issue "were questions" and therefore were not actionable).

Furthermore, that Rick Miller and Sangiuliano warned Plaintiff to "be careful" with respect to Marcey does not necessarily suggest that they condoned Marcey's alleged defamatory statements about her. With respect to Rick Miller, the Amended Complaint alleges that his warnings to Plaintiff to get out of Marcey's way related to certain business decisions that Marcey wanted to make, not to any rumors that Marcey was purportedly spreading about Plaintiff. Dkt. 12 ¶ 60 (alleging that Rick Miller warned Plaintiff to back down after "echo[ing] . . . Marcey's sentiments that they did not need the Partner Sales Engagement" and also warned Plaintiff after she mentioned that "incumbent Partners" were "being removed from a longstanding and profitable business transaction[]"). Regarding Sangiuliano's comments to her, Plaintiff alleges that she took his warning to "be careful" seriously "in light of . . . Marcey's threats to her family . . . and the damage he had done to . . . her professional and personal reputation." But none of these allegations establish that Sangiuliano approved of Marcey spreading purportedly false rumors about her—the most that the Court can infer from these allegations is that Sangiuliano understood Marcey to be dangerous and did not take any action to prevent him from continuing to harm Plaintiff.

Finally, Plaintiff does not provide the Court with enough factual context to conclude that Mike Miller quoting Marcey's alleged defamatory language to her at a networking event amounts

to ratification. In the Amended Complaint, Plaintiff asserts that, at a networking event, Mike Miller repeated Marcey's statement that she "slept her way to the top" to her. Dkt. 12 ¶ 84. Critically, however, Plaintiff alleges that Mike Miller quoted Marcey only after first telling Plaintiff, "[Red Hat] ha[s] hamstrung you every step of the way since you . . . joined." *Id.* Rather than indicating that Mike Miller was expressly adopting Marcey's alleged defamatory statement, Plaintiff's allegations suggest that Mike Miller was simply acknowledging the hardships that Plaintiff had endured while at Red Hat. Accordingly, without more, the Court cannot conclude that any Red Hat executives ratified Marcey's alleged defamatory statements.

In her Opposition to Defendant Red Hat's Motion to Dismiss, Plaintiff alternatively contends that Red Hat is liable for Marcey's alleged defamation based on principles of *respondeat superior*. Dkt. 23 at 7-10. The allegations in the Amended Complaint, however, foreclose her reliance on such a theory of vicarious liability. Under Virginia law, "an employer is liable for the tortious acts of its employee if the employee was performing his employer's business and acting within the scope of his employment when the tortious acts were committed." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 145 (4th Cir. 2018) (quoting *Plummer v. Ctr. Psychiatrists, Ltd.*, 476 S.E.2d 172, 174 (Va. 1996)). "The Supreme Court of Virginia has clarified that an employee's act falls within the scope of his employment only if (1) the act 'was expressly or impliedly directed by the employer, or is naturally incident to the business, and (2) it was performed . . . with the intent to further the employer's interest.'" *Id.* (quoting *Kensington Assocs. v. West*, 362 S.E.2d 900, 901 (Va. 1987)). Here, Plaintiff's Amended Complaint alleges precisely the opposite. Specifically, Plaintiff alleges that "to the extent . . . Marcey was or contends he was acting as an agent, he was acting outside the scope of that agency and not acting in the best interests of Defendants . . . ." Dkt. 12 ¶ 106. Such an admission that Marcey was acting in his own interests

and not in the interest of his employer plainly undercuts Plaintiff's attempt to raise a *respondeat superior* theory of liability.[5]

Because the Amended Complaint does not sufficiently plead that Defendant Red Hat ratified Defendant Marcey's behavior or that Defendant Marcey made the alleged defamatory statements within the scope of his employment, Plaintiff's defamation claim against Defendant Red Hat will be dismissed. Plaintiff's defamation claim against Defendant Marcey, however, can proceed past the motion to dismiss stage, but only based on the previously-identified portions of the seventh alleged defamatory statement.

### B. The Whistleblower Retaliation Claims

The Court now turns to Plaintiff's whistleblower retaliation claims under the FCA and Virginia's Whistleblower Statute against Defendant Red Hat. To plausibly state a claim for retaliation under the FCA, "a plaintiff must allege that (1) [s]he engaged in protected activity, (2) the employer knew about the activity, and (3) the employer took adverse action against [her] as a result." *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015) (citing *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir.2013)). Meanwhile, to establish a retaliation claim under the Virginia Whistleblower Statute, an employee must show that her employer retaliated against her because she in good faith reported a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official. *Colquitt v. Bon Secour*

---

[5] Confusingly, Plaintiff asserts throughout her Amended Complaint that, in spreading defamatory rumors about her, Marcey was simultaneously acting both within and outside the scope of his employment at Red Hat. *See* Dkt. 12 ¶ 90 ("Marcey is also individually liable for these statements, acting both within and outside the scope of his employment and position with Red Hat."); *id.* ¶ 105 ("Marcey was acting both within and outside the scope of his employment by making the statements at work conferences, meetings, and partner company events, through the use of improper and unlawful means . . . ."). Regardless, Plaintiff's admission that Marcey was not acting to further the interests of Red Hat is fatal to her *respondeat superior* theory.

*Mercy Health*, No. 4:21CV53, 2022 WL 479093, at *5 (E.D. Va. Feb. 16, 2022), *aff'd sub nom.*

*Colquitt v. Bon Secours Mercy Health*, No. 22-1288, 2022 WL 17848949 (4th Cir. Dec. 22, 2022)

(internal citations omitted). In the instant case, Defendant Red Hat argues that both of Plaintiff's

whistleblower retaliation claims must be dismissed because Plaintiff fails to allege (1) any

cognizable protected activity under either the FCA or Virginia's Whistleblower Law, and (2) any

plausible causal connection between her purported whistleblower actions and the adverse

employment actions she purportedly faced. Dkt. 16 at 18-29.

    1. Whether Plaintiff Has Alleged Any Cognizable Protected Activity Under the FCA

    To establish protected activity under the FCA, a plaintiff must "allege facts sufficient to

show that [s]he believed [her employer] was violating the FCA, that [her] belief was [objectively]

reasonable, that [s]he took action based on that belief, and that [her] actions were designed to stop

1 or more violations of the FCA." *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 173 (4th Cir.

2016) (internal quotation marks omitted). Defendant Red Hat argues that Plaintiff cannot meet

this standard because her belief that Red Hat engaged in fraud was not objectively reasonable.

This Court agrees.

    Relevant here, it "is a violation of the FCA to 'knowingly present[], or cause[] to be

presented, a false or fraudulent claim for payment' to the federal government." *Id.* In her

Amended Complaint, Plaintiff alleges that, in January 2022, she learned from TWS executives that

Marcey and potentially other Red Hat employees may have been receiving kickbacks on the VA

contract through Rucker and, based on that information, she believed that Red Hat was submitting

invoices containing false information to the VA for work performed by Rucker. Dkt. 12 ¶ 49.

Fatal to her claim, however, Plaintiff does not allege that she had any personal knowledge of Red

Hat's process for submitting invoices to the VA. Quite the opposite, Plaintiff merely alleges that

she went to Red Hat's legal department based on what a TWS executive allegedly told her "may" be occurring with Marcey and "potentially" other Red Hat employees, Dkt. 12 ¶ 49. In other words, her belief that Red Hat was committing FCA violations appears to have been based on speculative gossip, which, without more, cannot support an objectively reasonable belief. *See Scates v. Shenandoah Mem'l Hosp.*, No. 5:15-CV-00032, 2016 WL 6270798, at **5-6 (W.D. Va. Oct. 26, 2016) (holding that plaintiff failed to show that her belief that her employer was violating the FCA was objectively reasonable where she based her concern on a conversation she overheard at a seminar about billing issues); *Myers v. EBI, L.P.*, No. 4:04-CV-86-H(2), 2006 WL 8438565, at *5 (E.D.N.C. Mar. 27, 2006) (finding that plaintiff failed to show that he had a reasonable belief that fraud was being committed against the government where his allegations were based on "information he 'heard' from other employees that he had no personal knowledge of").

Plaintiff alternatively claims that she reasonably believed that Red Hat had violated the Anti-Kickback Statute ("AKS"). Dkt. 12 ¶ 114. To be sure, in certain limited circumstances, a violation of the AKS can constitute a basis for an FCA violation, but here, Plaintiff fails to allege any plausible violation of the AKS. On its face, the AKS prohibits kickbacks "in return for referrals or to induce referrals for which payment may be made under the Medicare or Medicaid programs." *Feldstein v. Nash Cmty. Health Servs., Inc.*, 51 F. Supp. 2d 673, 681 (E.D.N.C. 1999) (internal citation omitted). Critically, Plaintiff has not pleaded any facts to establish the applicability of the AKS to Red Hat's contract with a partner to sell what, from the Amended Complaint, appears to be software services, Dkt. 12 ¶ 3 (alleging that "Red Hat is a leading provider of enterprise open-source solutions"), to the VA, *see Myers*, 2006 WL 8438565, at *4 (finding that a plaintiff did not engage in protected activity under the FCA based on an alleged AKS violation where there were no allegations that the contracted individual was "a physician" or

"a health care provider" or that the contracted individual "referred any Medicare patients to [the alleged kickback recipient] for services"). Accordingly, the Court concludes that Plaintiff has failed to allege any protected activity for purposes of the FCA, and her FCA whistleblower retaliation claim thus cannot proceed past the motion to dismiss stage for that reason.

2. Whether Plaintiff Has Alleged Any Cognizable Protected Activity under the Virginia

Whistleblower Statute

In support of her Virginia Whistleblower Statute claim, Plaintiff asserts that the conduct she disclosed to Red Hat's legal department violated the FCA, AKS, and FAR. As discussed *supra*, Plaintiff has not plausibly alleged an objectively reasonable belief in a violation of the FCA or any violation of the AKS at all. The Court's analysis will therefore focus on whether Plaintiff can base her Virginia Whistleblower Statute claim on her report of a purported FAR violation.

The FAR prohibits conflicts of interests for "covered employee[s]," meaning employees who "perform[] an acquisition function closely associated with the inherently governmental function and [are] (1) . . . employee[s] of the contractor; or (2) . . . subcontractor[s who are] . . . self-employed . . . ." 48 C.F.R. § 3.1101. Among the sources of conflicts of interest listed in the regulation are "close family members." *Id.* at § 3.1101(a). In the instant case, Plaintiff alleges that Marcey was a covered employee pursuant to the FAR and that he wanted to replace TWS with V3Gate, where he had a family member. Dkt. 12 ¶ 114. Importantly, however, the FAR provision that Plaintiff cites only applies to "close family members"—not *all* family members, and Plaintiff does not allege the level of familial closeness between Marcey and his family member at V3Gate.[6]

---

[6] Plaintiff also alleges that she reported Marcey's violation of a FAR provision that proscribes subcontractor kickbacks, but the provision to which she cites is merely a summary of AKS obligations. *See* Dkt. 12 ¶ 114 (citing 48 C.F.R. § 3.502-2); 48 C.F.R. § 3.502-2 (summarizing the AKS). And as this Court has already found *supra*, Plaintiff has not plausibly alleged any violations of the AKS.

As such, Plaintiff has not sufficiently alleged that she reported any violations of law and thus cannot satisfy the protected activity prong of her Virginia Whistleblower Statute claim.

3. Whether Plaintiff Has Plausibly Alleged a Causal Connection Between Her Protected Activity and Any Adverse Employment Actions

Even if Plaintiff were able to establish that she engaged in protected activity, her whistleblower retaliation claims fail because she cannot show a causal connection between any purported protected activity and any adverse employment action that she experienced. In her Amended Complaint, Plaintiff asserts that Red Hat retaliated against her after she reported the alleged kickback scheme to the company's legal department by repeatedly condoning Marcey's behavior, subjecting Plaintiff to a "humiliating interrogation" about her relationships with men in the industry, failing to promote her to a position for which she was qualified some time between September and October 2022, and informing her in December 2022 that her position would be eliminated in February 2023. Dkt. 12 ¶¶ 77, 80, 82, 119-122.

To start, the first two purportedly retaliatory actions that Plaintiff relies on do not amount to materially adverse employment actions. As discussed *supra*, Plaintiff has not sufficiently alleged that Red Hat approved of Marcey's conduct towards her. Further, as other federal courts have held, "mere investigations by [a] plaintiff's employer cannot constitute an adverse action because they have no adverse effect on plaintiff's employment." *Mack v. Strauss*, 134 F. Supp. 2d 103, 114 (D.D.C. 2001), *aff'd*, No. 01-5122, 2001 WL 1286263 (D.C. Cir. Sept. 28, 2001); *see also Ware v. Billington*, 344 F.Supp.2d 63, 76 (D.D.C.2004) ("[A]lthough the discipline imposed as a result of an investigation may have a sufficiently adverse effect on plaintiff's employment to be actionable, the mere initiation of the investigation does not.").

And with respect to the remaining two adverse actions that Plaintiff alleges, any inference of a causal connection is undermined by the lengthy time lapse between Plaintiff reporting the kickback scheme to Red Hat's legal department in March 2022 and Red Hat deciding not to promote her in September or October 2022 and subsequently telling her that her position would be eliminated in December 2022. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two."). Although there is no bright line rule, the Fourth Circuit has declined to find causation where the gap between the protected activity and the alleged retaliation was only several months. *See Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) ("[A] two-month temporal gap . . . is sufficiently long so as to weaken significantly the inference of causation." (internal quotation marks and citation omitted)); *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (affirming district court's grant of summary judgment to defendant where gap was 10 weeks); *see also Agbati v. Virginia Dep't of Agric. & Consumer Servs.*, No. 3:19-CV-512, 2020 WL 4726291, at *3 (E.D. Va. Aug. 5, 2020), *aff'd*, No. 21-1097, 2022 WL 3543309 (4th Cir. Aug. 18, 2022) (dismissing Plaintiff's retaliation claim for failing to show a causal link where the alleged adverse action began at least five to six months after his protected activity). Here, Red Hat's decisions not to promote Plaintiff and to eliminate her position approximately six to seven months and nine months, respectively, after Plaintiff reported the alleged kickback scheme to the company's legal department are simply too far attenuated from the date of her purported protected activity to establish a temporal link. Given the absence of any non-conclusory allegations of a causal connection and the lengthy gap of time between Red Hat's cognizable adverse employment actions and Plaintiff's purported activity, the Court concludes that

Plaintiff fails to plausibly allege the causation element of her whistleblower retaliation claims. Accordingly, Counts II and III of her Amended Complaint will be dismissed for this reason as well.

## IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant Red Hat's Motion to Dismiss (Dkt. 15) is GRANTED and Defendant Marcey's Motion to Dismiss (Dkt. 17) is GRANTED-IN-PART AND DENIED-IN-PART; and it is

FURTHER ORDERED that Count I of the Amended Complaint is DISMISSED WITHOUT PREJUDICE only as to Defendant Red Hat; and it is

FURTHER ORDERED that Counts II and III of the Amended Complaint are DISMISSED WITHOUT PREJUDICE.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

/s/

Rossie D. Alston, Jr.
United States District Judge

Alexandria, Virginia
January 9, 2024