IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHRISTINE COX,                          )
                                        )
        Plaintiff,                      )
                                        )
    v.                                  )        Civil Action No. 1:23-cv-766 (RDA/WEF)
                                        )
RED HAT, INC., *et al.*,                )
                                        )
        Defendants.                     )

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the Court on Defendants Red Hat, Inc.'s ("Red Hat") and Bruce Marcey's ("Marcey") (collectively, "Defendants") Motions to Dismiss the Amended Complaint for Failure to State a Claim ("Motions to Dismiss"). Dkts. 52, 54. This Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Having considered the Motions to Dismiss together with Plaintiff Christine Cox's Second Amended Complaint (Dkt. 32-1), Defendants' Memoranda in Support (Dkts. 53, 55), Plaintiff's Oppositions (Dkts. 59, 60), and Defendants' Replies (Dkts. 61, 62), this Court GRANTS-IN-PART and DENIES-IN-PART Defendant Red Hat's Motion to Dismiss (Dkt. 52) and GRANTS-IN-PART and DENIES-IN-PART Defendant Marcey's Motion to Dismiss (Dkt. 54) for the reasons that follow.

1

# I. BACKGROUND

## A. Factual Background[1]

Plaintiff Christine Cox began working at Red Hat in March 2021 as the Senior Director of Civilian/National Security Sales.  Dkt. 32-1 ¶ 27.  Bruce Marcey was (and is) Red Hat's Account Executive for the Department of Veterans Affairs (the "VA").  *Id.* at ¶ 8.

Plaintiff's first day was March 29, 2021, and she reported to Nathan Jones, VP of North American Public Sector ("NAPS").  *Id.* ¶ 17.  Plaintiff alleges that she "[a]lmost immediately" encountered a "good ol' boys" club at Red Hat.  *Id.* ¶ 28.  Plaintiff asserts that, on day one, she was questioned regarding her credentials despite the extensive background check that she had undergone.  *Id.*  Plaintiff asserts that her male colleagues were not similarly questioned.  *Id.*

On May 5, 2021, in a meeting with Jones, Jones informed Plaintiff that he had heard complaints from members of the team that Plaintiff "doesn't listen – she tells" and that she was not effective in her hiring strategy.  *Id.* ¶ 30.  Jones stated that, because he did not have a level of "trust and comfort" with her yet, he would conduct one-on-one meetings with Plaintiff.  *Id.*  He did not conduct similar meetings with male colleagues.  *Id.*

On May 20, 2021, during a one-on-one meeting, Jones asked Plaintiff to pass on a 50% margin to a partner without the proper documentation.  *Id.* ¶ 31.  Plaintiff refused because she believed it was not legal or ethical.  *Id.*

---

[1] For purposes of considering Defendants' Motions to Dismiss, the Court accepts all facts contained within Plaintiff's Second Amended Complaint as true, as it must at the motion-to-dismiss stage.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

That same day, Plaintiff was given a situational debriefing regarding a Federal client within the Department of Homeland Security ("DHS") which had been oversold the year prior. *Id.* ¶ 32. Plaintiff alleges that Red Hat was trying to sell more software to a client that already had too much, ultimately causing DHS to cancel the contract, and resulting in the associated Red Hat team quitting. *Id.* Plaintiff alleges that Red Hat used Plaintiff to take the fall for the failed contract. *Id.* On June 1, 2021, Jones issued Plaintiff a verbal warning regarding her management skills, including the "telling versus listening" issue. *Id.* ¶ 33.

On June 8, 2021, Plaintiff's team hosted 40+ partners/clients at an event in Falls Church, Virginia. *Id.* ¶ 34. Jones was aware of the event and had approved Plaintiff's expenditures for the event but declined to attend due to other obligations. *Id.* ¶ 34.

On July 12, 2021, Plaintiff had a telephone discussion with a direct report, Jeremy Sontag, regarding his insubordination to Plaintiff. *Id.* ¶ 35. In response, Sontag: (i) told Plaintiff that she was not an effective leader; (ii) used expletives during the conversation and told Plaintiff to stay out of his business; and (iii) told Plaintiff that she was disruptive to the organization and a fraud. *Id.*

On July 14, 2021, Jones agreed to Red Hat's sponsorship of an event during the Government Business Executive Forum ("GBEF") in Las Vegas. *Id.* ¶ 37. On July 15, 2021, during the forum, Plaintiff was a panelist during a discussion. *Id.* ¶ 38. On July 16, 2021, during the Red Hat event, Plaintiff was left to host the event alone, even though other male colleagues were supposed to be hosting it with her. *Id.* ¶ 39. After the event, Senior Director of Federal Civil Sales Rick Miller told Jones and VP of Business Development Joe Sangiuliano that Plaintiff was "not qualified" to speak and asked, "who does she think she is, representing Red Hat." *Id.* ¶ 40.

3

After the GBEF, Jones placed Plaintiff on a Performance Improvement Plan ("PIP"). *Id.* ¶ 41. Jones stated that Plaintiff had presented herself as the VP of Federal for Red Hat and that she had "misrepresented the conference to him." *Id.* Jones also cited Plaintiff's alleged failure to "calm the room and stop the conversation if it gets emotional," referring to the meeting with Sontag. *Id.*

On July 20, 2021, Plaintiff reported to Human Resources ("HR") the events that transpired at the conference and her treatment by Jones, Sontag, Miller, and Nancy Bohannan.[2] *Id.* ¶ 42. As a result, Plaintiff was to have monthly check-ins with David Egts, then CTO for NAPS. *Id.*

In October 2021, Jones announced his retirement. *Id.* ¶ 43. Matt Simontacchi was asked to step in as Acting VP of NAPS, even though Plaintiff had more experience. *Id.* After Simontacchi assumed the role as Acting VP of NAPS, he was not responsive to requests from Plaintiff to set up a meeting. *Id.* ¶ 44.

Around this same time, Plaintiff became aware that Red Hat's Fed-C (National Security) Representative Kimberly Jaeger was not receiving appropriate compensation for her work in that territory. *Id.* ¶ 45. Plaintiff brought this to the attention of HR and Sanguilano,[3] who suggested that Jaeger was "hormonal," "too emotional," and should "be a good girl scout." *Id.* Plaintiff told Sanguilano that she was upset about his remarks. *Id.* ¶ 46.

In October, Miller assumed Jones' role as VP of NAPS. *Id.* ¶ 47. On October 18, 2021, Miller asked Plaintiff what she wanted to do with her career. *Id.* ¶ 48. Plaintiff told him that she would like to be promoted to VP of NAPS. *Id.* Thereafter, Plaintiff alleges that Miller "began a

---

[2] Bohannan is not previously mentioned in the Second Amended Complaint.

[3] Sanguilano is sometimes referred to as "Sangiuliano." As the Court is unsure which is correct, the Court will employ the name that appears most prevalent in the Second Amended Complaint.

smear campaign to defame and discredit" Plaintiff. *Id.* Miller told Simontacchi, Sanguilano, and others that he could not work with Plaintiff. *Id.* Red Hat then appointed Miller as an Acting VP. *Id.* On October 25, 2021, Plaintiff was then moved – at Miller's behest – to the Partner Ecosystem as Sales Director for the Public Sector. *Id.* ¶ 49. In October 2021, Clara Conti was hired as the Vice President and General Manager of NAPS. *Id.* ¶ 50. On October 27, 2021, Plaintiff made Conti aware of her impression that the "good ol' boys club" was "out to get" Plaintiff. *Id.* Plaintiff and Conti agreed that a Government Compliance Officer needed to oversee NAPS which was, according to Plaintiff, like the "wild, wild West." *Id.* After that discussion, Plaintiff began advocating for a Government Compliance Officer who would "make the ethical call when issues arise." *Id.* ¶ 51.

On November 11, 2021, Plaintiff attended a retirement party for Paul Smith, who told Plaintiff that she should feel "uncomfortable" because Jones was attending. *Id.* ¶ 52. Other male employees (VP North America Ecosystem Partner Management Mike Byrd and Go to Market Director, NAPS, Eamon McCormick) stated: "Aren't you uncomfortable being here since you single handedly destroyed a legend?" and "How are you surviving?" *Id.* These comments made Plaintiff feel uncomfortable and she left the party. *Id.* Byrd and Jones were known in the industry as "Red Hat legends." *Id.* ¶ 53.

On December 23, 2021, Plaintiff met with BD of Finance Kathleen O'Flaherty at the Army Navy Country Club. *Id.* ¶ 54. O'Flaherty told Plaintiff that Lynda Kuhn, who ran finance under Rick Miller, did not want to work with Plaintiff. *Id.* O'Flaherty stated that "they had been directed by management not to see the value of working with Ms. Cox." *Id.*

Another GEBF conference was scheduled for January 2022 in Las Vegas and Plaintiff had secured a speaking engagement there for Conti. *Id.* ¶ 55. President and CEO of GEBF Don Upson

specifically asked that a woman be on stage for the engagement and requested, Conti, VP of Global Partner Ecosystem, Stefani Chivras, or Plaintiff. *Id.* In late December 2021, Miller instructed Conti to "back out" because of an alleged issue with a contract with the U.S. Patent and Trademark Office. *Id.* ¶ 56. Egts then volunteered to cover for Conti but also had to back out when he tested positive for Covid. *Id.* John Dvorak then stepped in and also came down with Covid. *Id.* Sanguilano then stated it would be better if he stepped in because he "needed it for [his] career." *Id.* Plaintiff was embarrassed. *Id.*

Prior to Plaintiff's employment at Red Hat, "TWS" had worked with Red Hat in order to secure a multimillion-dollar contract with the VA. *Id.* at ¶ 57. The contract included a base year and two options to extend and involved TWS, Red Hat, and the distributors Carahsoft and DLT Solutions. *Id.* Shortly before the deal was set to close, Marcey informed TWS about what Red Hat's margin would need to be and told TWS that he would need to include "his guy," contractor John Rucker in the deal. *Id.* Plaintiff alleges that Marcey refused to provide a "scope of work" for Rucker and falsely represented that Red Hat did not have "market funds to pay consultants and was using Rucker." *Id.* TWS agreed to Marcey's terms. *Id.*

When the time came to renew the contract with the VA in January 2022, TWS attempted to negotiate with Red Hat once again. *Id.* This time, however, TWS required a "scope of work" for Rucker as a condition for TWS' work on the contract. *Id.* Marcey again refused to provide that information, causing a breakdown in negotiations. *Id.* Marcey then replaced TWS on the VA contract with another company, V3Gate, where he had a family member, without considering bids for replacement partners. *Id.*

In January 2022, Plaintiff learned from executives at TWS that Marcey may have been receiving kickbacks on the VA contract through Rucker. *Id.* ¶ 49. Based on the information that

6

she received, Plaintiff believed that Marcey had been submitting false invoices for work that Rucker was purportedly doing, and that Rucker had been sending Marcey some of the money that the VA had awarded for the contract.  *Id.*

After receiving this information, Plaintiff questioned Marcey regarding the alleged kickback scheme, and Marcey responded that she should "mind [her] fucking business." *Id.* ¶ 59. Plaintiff later met with Red Hat's Legal Department to discuss the ethics and legality of Marcey removing TWS as a partner, Marcey's alleged scheme with Rucker, and the need for Federal Acquisition Regulation System ("FAR") compliance.  *Id.* ¶ 60.

Plaintiff asserts that, after she reported her concerns to Red Hat's Legal Department in March 2022, Marcey embarked on a continuous, months-long campaign of disparaging her.  *Id.* ¶ 61.  In January 2022, Marcey called Plaintiff a "slut" during a meeting with the VA/Health and Human Services ("HHS") team.  *Id.* ¶¶ 62.  Conti wrote up Marcey for the remark.  *Id.*

On March 10, 2022, Marcey told Nina Groth, a Partner Sales Ecosystem Rep, that Groth did not know anything about the VA and to "stay out of [his] business." *Id.* ¶ 63.  Plaintiff defended Groth and ended the meeting.  *Id.*  Plaintiff then called Miller and voiced concerns regarding Marcey's "conduct toward females." *Id.*

On March 16, 2022, at a HIMSS Global Health Conference in Orlando, Florida, Plaintiff learned that Marcey had been calling her a "slut" and a "whore" saying "she won't be around long." *Id.* ¶ 64.  John Meier tried unsuccessfully to dissuade Marcey from making such statements. *Id.*  Plaintiff later had difficulty entering a Red Hat event at the conference because Miller and Mike Lanier, a VA Team Systems Engineer, had excluded Plaintiff from the guest list.  *Id.* ¶ 65. Miller and Lanier then gave the bartender the directive that Plaintiff was not permitted to buy

drinks on behalf of the clients that she was hosting. *Id.* The restriction was later lifted when the client confronted them. *Id.*

At a Capitals game with Proofpoint partner Skip Leisgang, Leisgang told Plaintiff that "Marcey wants to 'off' your family over the VA deal and has proof you have screwed Greg Feldman [the CEO of TWS]." *Id.* ¶ 66. He said he had heard it from Brian Strosser of Optiv who had heard it from Marcey. *Id.*

In March 2022, Plaintiff was moved to the Partner Ecosystem side of the business and was running "an $890M quota." *Id.* ¶ 67. In this role, Plaintiff was given insufficient staffing and had to advocate for additional staffing. *Id.*[4]

On March 29, 2022, Plaintiff had a confidential discussion with Legal regarding Marcey, including his treatment of her. *Id.* ¶ 68. In March 2022, Plaintiff was informed by Mike McCalip of Carahsoft that Marcey had told him that she "slept with Greg Feldman." *Id.*

In April 2022, Plaintiff met with Sally Barth of HR regarding the inadequate staffing of her team. *Id.* ¶ 70.

At some other point, Miller told Plaintiff that Red Hat did not need Partner Sales Engagement and that she should not "push Bruce's buttons" and her team should "stay in [its] swim lane." *Id.* ¶ 71. Plaintiff tried to disagree but was told to stop "playing with fire" and to "stand down." *Id.* Plaintiff assured Miller that she would work within the rules but later learned that Miller tried to enlist Sanguilano to have her fired. *Id.*

Around this same time, Plaintiff told Barth the rumors that she had heard Marcey was starting. *Id.* ¶ 72. Plaintiff alleges that "Marcey continued his campaign to disparage, discredit[,]

---

[4] Confusingly, in her discussion of what was happening in March 2022, Plaintiff alleges that she "was passed over for promotion again in October 2022." *Id.* ¶ 67. But there are no facts as to what role she is referring.

and defame [Plaintiff] by calling her a 'fucking whore,' 'slut,' and 'cunt.'"  *Id.* ¶ 73.  Plaintiff stated that she had elevated the issue to Sanguilano and Chris Gray, VP of North American Ecosystem.  *Id.*[5]  Plaintiff told Barth that Sanguilano told Plaintiff to "be careful."  *Id.*

Around this same time, Miller removed Plaintiff's name plaque and personal belongings from her office and wrote "New Hire" on her door.  *Id.* ¶ 76.

A TWS partner later alerted Plaintiff that Marcey had also threatened Keith Foley's (of Third Wave) and Feldman's families as well.  *Id.* ¶ 77.  On April 20, 2022, Marcey told Jon Meier of Third Wave and Foley that Plaintiff had "slept her way to the top," that she had "slept with Greg Feldman," and that she was a "whore."  *Id.* ¶ 78.

Marcey later told other partners/vendors: (i) "Don't work with her or talk to her as a Red Hat employee as I am getting her fired and she won't be around long"; (ii) she "slept [her] way to the top"; and (iii) "[s]he slept with Greg Feldman which is why she wants TWS in the VA deal."  *Id.* ¶ 79.  Plaintiff alleges that these remarks were made to vendors several times throughout 2022, including a conference in December 2022.  *Id.* ¶ 80.

On April 22, 2022, Plaintiff discussed with the VA team how they could help make up a gap in Conti's budget, but they did not want to hear it.  *Id.* ¶ 82.  In sharp contrast, when Chris Smith later replaced Conti, Plaintiff started receiving calls regarding how to position her transactions.  *Id.* ¶ 83.

On May 11, 2022, Miller followed up with Plaintiff and Mike Miller, VP for Enterprise Sales, asking them to stand down on a meeting with Alex Alcantara, a contracting officer for the VA.  *Id.* ¶ 84.

---

[5] Chris Gray is sometimes referred to as "Chris Grey."

Feldman spoke to Mike Miller about Marcey's unreasonable behavior, and that action needed to be taken. *Id.* ¶ 85. Marcey's conduct continued to be unaddressed by HR. *Id.* ¶ 86. Later, the VA reached out to Plaintiff and Mike Miller regarding the contract, which infuriated Marcey. *Id.* ¶ 87.

On July 27, 2022, Meier of TWS was still attempting to negotiate a contract with Marcey. *Id.* ¶ 88. During a call, Marcey told Meier that Plaintiff was a "fucking whore," that Plaintiff "slept with Greg Feldman," and that she "slept her way to the top." *Id.* Marcey also told Meier that Plaintiff was "sleeping with Jim Boykin" of Fed Civ Partners. *Id.*

On July 28, 2022, Meier told Mike Miller that he was upset regarding Marcey's behavior. *Id.* ¶ 89. Meier also reiterated that he was concerned regarding Rucker and the lack of a compliance officer at Red Hat. *Id.* Mike Miller stated that he would follow up, but no action was taken. *Id.*

In July 2022, Plaintiff again reported Marcey's behavior and the kickback scheme to HR and Legal, but no action was taken. *Id.* ¶ 90. In a meeting with Legal, Plaintiff was interrogated regarding her relationship with men in the industry:

- "Ms. Cox was asked about her relationship with Greg Feldman and if Ms. Cox had sexual relations with him (NO);

- Ms. Cox was asked about her relationship with Jim Boykin and if Ms. Cox had relations with him (NO);

- Ms. Cox was asked about her affiliation with Settle Down Easy Brewery (whether Ms. Cox was an owner (NO), and whether having her team meetings there was ethical – Ms. Cox was falsely accused of kickbacks from the brewery);

- Ms. Cox was asked about fishing trips with TWS – if it was ethical and whether Ms. Cox had attended for business or for a sexual relationship. This was particularly insulting and demeaning coming from Bruce Marcey. Apparently, it was acceptable for men to go on fishing trips and elk hunting in Montana with TWS, but women could not participate in similar sporting trips without being accused of sleeping with the partner/client;

- Ms. Cox was questioned about all of her expenses in line-by-line detail – it was impossible to recall all of the details off the top of her head, and Ms. Cox realized this was all being done to retaliate against and to intimidate her." *Id.*

Meier informed Plaintiff that Marcey continued to disparage her through August 2022. *Id.* ¶ 91. From September 28, 2022, through October 5, 2022, Plaintiff interviewed to be VP of Ecosystem. *Id.* ¶ 93. Plaintiff was informed that Red Hat had decided not to hire anyone for the position. *Id.* When Plaintiff asked Gray about it in December 2022, he was elusive. *Id.* ¶ 94.

On December 12, 2022, during a call, Smith informed Plaintiff that her position was being eliminated effective February 13, 2023. *Id.* ¶ 95. Plaintiff was given until March 1, 2023, to find a job within Red Hat. *Id.* Plaintiff applied for a lesser position of Director, Partner Ecosystem Sales, where she had previously been the Senior Director, but was told that she did not get the position. *Id.*

On January 29, 2023, Plaintiff was asked by Barth whether Plaintiff had cancelled her registration to Sales Kick Off in Dallas, Texas. *Id.* ¶ 97. Plaintiff had not, but "Red Hat took that opportunity away." *Id.*

On January 30, 2023, Garrett Goldstein sent out a LinkedIn post announcing his hiring as the new Partner Sales Ecosystem Director for Public Sector for Red Hat. *Id.* ¶ 98. This was Plaintiff's former position, which she had been told was eliminated. *Id.*

On March 1, 2023, at a networking event, Mike Miller told Plaintiff that Red Hat "hamstrung you every step of the way since you have joined." *Id.* He further intimated that Conti was only hired because "she was a nice looking female" and that Red Hat only wanted "a nice looking female." *Id.* He further stated: "You're the one who 'slept her way to the top.'" *Id.*

When Meier and Conti informed Rick Miller of the defamatory statements Marcey made about Plaintiff, Miller replied "Christine deserved it." *Id.* ¶ 99.

11

Plaintiff alleges that, as a result of Red Hat's treatment, she has sought treatment for anxiety and emotional distress and that Defendant's treatment exacerbated a seizure disorder that she has. *Id.* ¶ 101.

On May 11, 2023, Plaintiff filed a Charge of Discrimination (the "Charge") with the Equal Employment Opportunity Commission (the "EEOC") which was cross-filed with the Office of the Attorney General of Virginia – Office of Civil Rights. *Id.* ¶ 21.  On December 7, 2023, the EEOC issued a right to sue letter. *Id.* ¶ 22.  On December 19, 2023, the Office of Civil Rights issued a right to sue letter. *Id.* ¶ 23.

## B. Procedural Background

Plaintiff initially filed suit against Defendants Red Hat and Marcey in the Circuit Court of Fairfax County, Virginia on May 11, 2023.  Dkt. 1 ¶ 1.  Defendants then removed the instant action to this Court on June 13, 2023.  Dkt. 1.  On June 20, 2023, Defendant Red Hat filed its First Motion to Dismiss, Dkt. 4, and on June 30, 2023, Defendant Marcey filed his First Motion to Dismiss, Dkt. 8.  Plaintiff subsequently filed an Amended Complaint against Defendants Red Hat and Marcey on July 10, 2023, Dkt. 12, and this Court then denied Defendants' First Motions to Dismiss as moot on July 18, 2023, Dkt. 14.

On July 24, 2023, Defendants filed their respective Motions to Dismiss the Amended Complaint.  Dkts. 15, 17.  On January 9, 2024, the Court issued its Memorandum Opinion and Order granting Red Hat's Motion to Dismiss and granting in part and denying in part Marcey's Motion to Dismiss.  Dkt. 31.  In relevant part, the Court: (i) dismissed the defamation claims against Red Hat; (ii) found that Plaintiff's claim against Marcey was actionable to the extent it was based on the statement from Marcey to Meier that Plaintiff had "slept with Greg Feldman," was

"sleeping with Jim Boykin," is a "whore," and had "slept her way to the top"; and (iii) dismissed Plaintiff's whistleblower claims. *Id.*

Thereafter, Magistrate Judge William E. Fitzpatrick granted Plaintiff leave to file a Second Amended Complaint. Dkt. 51; Dkt. 32-1. On March 29, 2024, Defendants filed the pending Motions to Dismiss. Dkts. 52, 54. On April 12, 2024, Plaintiff filed her Oppositions. Dkts. 59, 60. On April 18, 2024, Defendants filed their Replies. Dkts. 61, 62.

## II. STANDARD OF REVIEW

A Rule 12(b)(6) motion tests the sufficiency of a complaint. *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011). "[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level[,]'" and dismissal of the motion is appropriate only if the well-pleaded facts in the complaint "state a claim that is plausible on its face." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

At the motion-to-dismiss stage, a plaintiff need only "allege facts sufficient to state all the elements of her claim," *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003), and "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff],'" *Dao v. Faustin*, 402 F. Supp. 3d 308, 315 (E.D. Va. 2019) (quoting *United States v. Triple Canopy, Inc.*, 775 F.3d 628, 632 n.1 (4th Cir. 2015)). Still, "[c]onclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc. v. J.D. Assoc.*

*Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000) ("[W]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . Similarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments."). And "[g]enerally, courts may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion." *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017) (citing *Goldfarb*, 791 F.3d at 508).

## III. ANALYSIS

In the Second Amended Complaint, Plaintiff: (i) asserts a defamation claim against Marcey (Count 1); (ii) attempts to resurrect her defamation claims against Red Hat after they were previously dismissed (Count 2); (iii) asserts a discrimination and hostile work environment claim against Red Hat pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") and the Virginia Human Rights Act (the "VHRA") (Count 3 and 5); (iv) asserts a Title VII and VHRA retaliation claim against Red Act (Counts 4 and 6); and (v) asserts claims of intentional infliction of emotional distress ("IIED") against Marcey and Red Hat (Counts 7 and 8). Red Hat seeks to dismiss all of the claims against it with prejudice. Dkt. 53. Marcey seeks to dismiss the new allegations of defamation in Count 1 and the IIED claim in Count 7. The Court will address each claim in turn.[6]

---

[6] To the extent Plaintiff argues that Judge Fitzpatrick's grant of her Motion to Amend precludes Defendants arguments here, Plaintiff is mistaken. To begin with, as Defendants correctly note, Judge Fitzpatrick was analyzing the Motion to Amend under Rule 15(a) and whether the proposed amended complaint was futile. Dkt. 56 at 17. He did not examine the Second Amended Complaint under Rule 12(b)(6) and, indeed, specifically recognized that the questions raised by the parties may be appropriately resolved on a motion to dismiss. *Id.* at 10 ("And I'm not saying the points that you're arguing are not right or have merit; I'm just not sure that they're persuasive [on] this issue at this time and on this motion."); *id.* at 9-10 ("Futility oftentimes is ultimately going to be resolved on a motion to dismiss or a motion for summary judgment."). Moreover, by statute, magistrate judges are limited in what they can decide. In particular, 28 U.S.C. § 636(b)(1)(A) specifically carves out motions to dismiss from the list of motions that magistrate judges are designated to hear (unless such matters are referred for a report and recommendation). Additionally, Plaintiff's citations to decisions by this Court are unavailing

## A. The Defamation Claim

In the Memorandum Opinion and Order, the Court previously found that Plaintiff had properly alleged a defamation claim against Marcey premised upon his statements to Meier that Plaintiff had "slept with Greg Feldman," was "sleeping with Jim Boykin," is a "whore," and had "slept her way to the top." Dkt. 31 at 14. The Court also determined that such statements were not attributable to Red Hat. *Id.* at 21.

In her Second Amended Complaint, Plaintiff adds new allegations regarding a statement made in December 2022 when Marcey told O'Flaherty, Meier, Foley, and Antoine Harden of Google: "Don't work with [Plaintiff] or talk to her as a Red Hat employee as I am getting her fired and she won't be around long," that she "slept [her] way to the top," and "[s]he slept with Greg Feldman which is why she wants TWS in the VA deal." Dkt. 32-1 ¶¶ 103-04.

### 1. Whether the Added Statements are Time-Barred

As a threshold matter, the Court considers whether the additional alleged statements are barred by the statute of limitations. "In Virginia, there is a one-year statute of limitations for defamation claims which begins to run from the 'date of publication.'" *Shomo v. Napa Mgmt. Servs. Corp.*, 2022 WL 17477066, at *5 (E.D. Va. Dec. 6, 2022) (quoting *Katz v. Odin, Feldman & Pittleman, P.C.*, 332 F. Supp. 2d 909, 914 (E.D. Va. 2004)); *see also* Va. Code § 8.01-247.1 ("Every action for injury resulting from libel, slander, insulting words, or defamation shall be brought within one year after the cause of action accrues."). Here, Plaintiff filed her initial

---

and inapposite as those cases addressed parties' motions for reconsideration or renewed motions, which stand in a starkly different procedural posture than the Court is faced with here. Dkt. 59 at 8 (citing cases). Accordingly, Judge Fitzpatrick's decision on futility of amendment is not a basis on which to deny any aspect of the Motions to Dismiss.

Complaint on May 11, 2023. Dkt. 1-2. Plaintiff then amended her Complaint on July 10, 2023. Dkt. 12. Plaintiff's Second Amended Complaint was filed in 2024.[7]

Marcey's statute-of-limitations argument is essentially that Plaintiff's allegations in paragraphs 103 and 104 do not relate back to the Amended Complaint. Dkt. 55 at 9. But as Marcey acknowledges, paragraphs 103 and 104 contain allegations that are a "slightly expanded version of the 'sixth statement' from [P]laintiff's First Amended Complaint." Dkt. 55 at 5. It then follows that Marcey necessarily concedes that these allegations were contained in the Amended Complaint. Courts in the Commonwealth of Virginia have held that this is sufficient to preserve a defamation claim for purposes of the statute of limitations. *See, e.g.*, *Stanley v. Storck*, 2003 WL 22387076, at *2 (Va. Cir. Ct. May 9, 2003) (denying a statute of limitations defense where "the content of the statements was included in the original pleadings"). Accordingly, because the content of the statements was alleged in the Amended Complaint, the Court denies Marcey's Motion to Dismiss in this regard.

To the extent that Red Hat makes the same arguments in its Motion to Dismiss with respect to Count 2, that Motion is likewise denied with respect to the statements made in December 2022. On the other hand, to the extent that the allegations made against Red Hat include references to statements made "several times throughout 2022" those claims would be both: (i) time-barred because they are made for the first time in the Second Amended Complaint in 2024 more than one year after the statements were alleged to be made and (ii) unspecific, as discussed *infra*. Accordingly, the Red Hat's Motion will be granted in part and denied in part in this regard.

---

[7] For purposes of this analysis, it does not matter whether the filing date is the date the motion to amend (attaching the proposed amended complaint) or the date that Magistrate Judge Fitzpatrick granted the motion, because both occurred in 2024. Thus, if the statements were made for the first time in the Second Amended Complaint, they would be untimely.

2. Whether the Added Allegations Plausibly State a Claim

To survive a motion to dismiss a defamation claim, a plaintiff in Virginia must plausibly plead the following elements: "(1) publication of (2) an actionable statement with (3) the requisite intent." *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783 (4th Cir. 2018) (citing *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015)). Marcey argues that the allegations contained in paragraphs 103 and 104 must be dismissed because: (i) they lack specificity; (ii) they are based on opinion; and (iii) they lack the requisite intent. The Court will address each argument in turn.

Marcey first argues that added allegations in the Second Amended Complaint cannot support a defamation claim because they lack the requisite specificity. Plaintiff has alleged that the statements were made in "December 2022." Dkt. 32-1 ¶¶ 103-04. Relying on the same cases that this Court relied on in its prior Memorandum Opinion and Order, Marcey argues that "December 2022" is not specific enough. Dkt. 55 at 6 (citing cases); Dkt. 31 at 11 (citing cases). Yet, those cases recognize that, although a plaintiff needs to set forth some details regarding the alleged defamatory statement, a plaintiff is not required in these instances to meet a "heightened pleading standard." *Shafer v. Carter*, 2023 WL 5610194, at *6 n.9 (W.D. Va. Aug. 30, 2023); *Skillstorm, Inc. v. Elec. Data Sys.*, 666 F. Supp. 2d 610, 619 n.1 (E.D. Va. 2009) (same). Indeed, the Fourth Circuit has held that it is erroneous for a district court to apply a stricter standard and a defamation complaint must be treated "like any other civil complaint in federal court." *Hatfill v. New York Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005).[8]

Here, Plaintiff has met her obligation to plausibly allege facts regarding "'a speaker, the substance of the statement, when the statement was made, and why the statement is defamatory.'"

---

[8] Although the *Hatfill* case was decided in 2005, it remains good law, and the Fourth Circuit continues to cite it for this proposition. *See Edwards v. Am. Medical Ass'n, Inc.*, 2025 WL 444424, at *2 (4th Cir. Feb. 10, 2025) (citing *Hatfill*, 416 F.3d at 329).

*Shafer*, 2023 WL 5610194, at *6.  Plaintiff has now additionally alleged the timeframe in which the alleged defamatory statements were made (December 2022) and the specific persons to whom the alleged defamatory statements were made (O'Flaherty, Meier, Foley, and Harden).[9]  Thus, the motion will be denied with respect to these specific allegations.  Marcey is correct, however, in one respect.  Plaintiff may not base her claims on other unspecified vendors for the same reasons stated in the prior Memorandum Opinion and Order.  Dkt. 31 at 11.  Thus, Plaintiff's Second Amended Complaint fails to state a defamation claim to the extent that it continues to be premised on unidentified "Partners/vendors."  Dkt. 32-1 at ¶¶ 103-04 (alleging statements made to "Partners/vendors within the Public Sector community, including, but not limited to" the specified partners/vendors).  Accordingly, the Motion to Dismiss on this basis will be granted to the extent that the Second Amended Complaint attempts to premise the defamation claim in Count 1 on unidentified partners or vendors.

To the extent that Red Hat makes the same arguments in its Motion to Dismiss with respect specificity as to Count 2, that Motion is likewise granted in part and denied in part.  With respect to the statements in paragraphs 103 and 104, the Court finds that those allegations are made with the requisite specificity insofar as they were made in December 2022 and were made to O'Flaherty, Meier, Foley, and Harden.  To the extent Plaintiff intends to assert other alleged defamatory statements against Red Hat that were made to "Partners/Vendors . . . several times throughout 2022" those statements are not specific enough.  *See* Dkt. 31 at 11 (finding similar alleged statements lacked specificity).

---

[9] Other paragraphs in the Second Amended Complaint link these statements even more specifically to a "business conference sponsored by CyberSense in December 2022."  Dkt. 32-1 ¶ 80.

Marcey next argues that the statements in paragraphs 103 and 104 are not actionable because they constitute opinions. To be actionable, statements must be "both false and defamatory." *Couric*, 910 F.3d at 783. As the Court previously noted: "it follows that statements that are not factual assertions cannot be the basis for defamation liability" and the "typical example of this is an opinion." Dkt. 31 at 12. Simply put: "[s]tatements that express only the speaker's opinion and not matters of fact are not actionable as defamation because such statements cannot be shown to be false." *Dragulescu v. Va. Union Univ.*, 223 F. Supp. 3d 499, 509 (E.D. Va. 2016) (quoting *Gov't Micro Res., Inc. v. Jackson*, 271 Va. 29, 40 (2006)). Here, this Court has already determined that the following statements were actionable when they were alleged to be made in July 2022: (i) that Plaintiff "slept with Greg Feldman"; (ii) that Plaintiff "was sleeping with Jim Boykin"; (iii) that Plaintiff is a "whore"; and (iv) that Plaintiff had "slept her way to the top." Dkt. 31 at 13. To the extent paragraphs 103 and 104 of the Second Amended Complaint assert that Marcey repeated these same allegations, the Court finds that they are actionable for the same reason previously stated. *Id.*

That leaves the new statement: "Don't work with her or talk to her as a Red Hat employee as I am getting her fired and she won't be around long." Dkt. 32-1 ¶ 103. This statement concerns a possible future event and therefore is not provably false. Rather, Marcey's statement evinces an intent regarding what he hoped and intended to bring about but does not reflect any statement of fact. *See WCP/Fern Exposition Servs., LLC v. Hall*, 2011 WL 1157699, at *13 (W.D. Ky. Mar. 28, 2011) (recognizing that a statement "qualifies as privileged opinion because it was simply a prediction about a possible future event; it thus could not be grounded in any fact, must less a defamatory one, and is protected as pure opinion"). Accordingly, to the extent that Plaintiff's

defamation claim is premised on this statement, it is not actionable, and Plaintiff has failed to state a plausible claim.

Finally, Marcey argues that Plaintiff has not alleged facts demonstrating the requisite defamatory intent with respect to the new December 2022 statements.  Although Marcey makes a cursory argument in this regard, the Court has already addressed this issue and sees no reason to deviate from its prior holding.  Dkt. 31 at 16-17.  As the Court noted previously, Plaintiff has pleaded facts demonstrating actual malice because she has alleged facts that: (i) Marcey engaged in a smear campaign in response to her having questioned his dealings with Rucker; (ii) Marcey was making these statements in an attempt to get her fired; and (iii) Marcey used vulgar language evincing personal spite.  *Id.*  Accordingly, the Court finds that Plaintiff has also plausibly alleged intent with respect to the December 2022 statements.

In sum, the Court will grant in part and deny in part Marcey's Motion to Dismiss with respect to Count 1.  The Court will grant the Motion to the extent that Plaintiff attempts to premise her defamation claim on statements made to certain unidentified vendors or partners.  The Motion will otherwise be denied with respect to Count 1.

### 3. Whether Defendant Red Hat Can Be Held Liable for Marcey's Statements

In Count 2, Plaintiff seeks to hold Red Hat liable for Marcey's Statements.[10]  Plaintiff first seeks to do so under a theory of *respondeat superior*.  In the Memorandum Opinion and Order,

---

[10] As an initial matter, the Court agrees with Red Hat that the five alleged defamatory statements that the Court previously dismissed as time-barred (Dkt. 31 at 7-10) cannot form the basis of Count 2 against Red Hat.  Likewise, the alleged statements that Plaintiff is a "cunt," that the Court previously found to be an opinion statement, cannot form the basis of a defamation claim against Red Hat or Marcey in the Second Amended Complaint.  Dkt. 31 at 13.  Those rulings are the law of the case and Plaintiff has not sought reconsideration of those holdings.  *See TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) (holding "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case").  Those allegations may, however, have relevance to Plaintiff's other claims.  Accordingly, to the

the Court also dismissed Plaintiff's claim of *respondeat superior* against Red Hat because Plaintiff expressly alleged that "he was acting outside the scope of that agency and not acting in the best interests of Defendants." Dkt. 31 at 20.  Here, Plaintiff has deleted that allegation, but that does not cure the deficiency for three reasons.

First, Plaintiff may not directly contradict her prior pleadings.  *See Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 171 (D.D.C. 2013) ("A plaintiff, however, may not plead facts in their amended complaint that contradict those in their original complaint."); *Colliton v. Cravath, Swaine & Moore LLP*, 2008 WL 4386764, at *6 (S.D.N.Y. Sept. 24, 2008)( "Where a plaintiff blatantly changes his statement of the facts in order to respond to the defendant['s] motion to dismiss . . . [and] directly contradicts the facts set forth in his original complaint a court is authorized to accept the facts described in the original complaint as true.").[11]  Thus, Plaintiff's deletion of the allegation that Marcey was acting outside the scope of his employment does not mean that the Court may ignore Plaintiff's judicial admission in that regard.  Second, for the same reasons that Plaintiff has satisfied the actual malice standard with respect to Marcey, Plaintiff cannot demonstrate that Marcey was acting within the scope of employment here.  Plaintiff has not sought to have the Court reconsider its finding that her allegations establish that Marcey acted out of "personal spite and revenge." Dkt. 31 at 17.  Indeed, Plaintiff expressly relies on the Court's holding to oppose Marcey's Motion to Dismiss. Dkt. 60 at 8.  Plaintiff may not rely on that finding on the one hand

---

extent that those previously dismissed statements form the basis of any defamation claim in Count 1 or Count 2, they are dismissed, but they will not be stricken from the Second Amended Complaint.

[11] Plaintiff does not address this argument except to cursorily say that Magistrate Judge Fitzpatrick did not accept it. Dkt. 59 at 6.  But again, that was not Judge Fitzpatrick's role in determining whether the allegations were futile.  And, having failed to address the substance of Red Hat's argument, "the Court may consider the argument conceded."  *Polidi v. Mendel*, 2023 WL 5673116, at *3 (E.D. Va. Sept. 1, 2023).

but argue that Marcey acted within the scope of his employment on the other. Finally, Plaintiff has not alleged sufficient facts demonstrating that Marcey was acting in Red Hat's bests interests. *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 145 (4th Cir. 2018) ("The Supreme Court of Virginia has clarified that an employee's act falls within the scope of his employment only if . . . it was performed . . . with the intent to further the employer's interest."). Here, Plaintiff has not alleged sufficient facts to demonstrate that Marcey's statements were intended to benefit Red Hat's interests (instead of his own): (i) where he was discouraging partners or vendors from working with a Red Hat employee and (ii) where, in those same conversations, he allegedly would communicate threats to those partners or vendors. Accordingly, Plaintiff has not plausibly alleged facts supporting a *respondeat superior* theory of defamation.

Plaintiff also attempts to attribute liability to Red Hat based on Marcey's statements under a ratification theory. The Court previously rejected this theory as well. Dkt. 31 at 18-20. The parties assert that the new allegation pertinent to ratification are the allegations that Rick Miller, Red Hat's Senior Director of Federal Civil Sales, when informed of Marcey's statements, responded "Christine deserved it." Dkt. 32-1 ¶¶ 99, 118; Dkt. 53 at 10; Dkt. 59 at 18-19.[12] Red Hat first argues that to the extent that this allegation imputes liability to Red Hat it would be time-barred because Conti, who was alleged to be part of the meeting, ceased to work for Red Hat in May 2022. Dkt. 53 at 10. Red Hat reads too much into the reference to Conti. In paragraph 118, which is the paragraph made particularly with respect to Count 2, Plaintiff alleges that Conti and Meier informed Rick Miller of Marcey's statements after all of the statements referred to in

---

[12] The Court's analysis here centers on Rick Miller's comment as that was the statement on which the parties focused. The Court notes, however, that it appears Plaintiff has alleged a second form of ratification by Red Hat in that Mike Miller the VP of Enterprise Sales for Red Hat also endorsed and affirmed Marcey's statements when he is alleged to have said "You're the one who 'slept her way to the top.'" Dkt. 32-1 ¶ 97.

paragraphs 79-80 of the Second Amended Complaint were made; this includes the statements made in December 2022. Dkt. 32-1 ¶¶ 79-80, 118. In her Opposition Brief, Plaintiff specifically argues that the Second Amended Complaint should be read to assert that Rick Miller "made his ratifying comments either in or after December 2022." Dkt. 59. Thus, the Court does not understand Plaintiff's ratification theory to rely on the time-barred allegations and the Motion to Dismiss will be denied in this regard.[13]

Red Hat's other argument is that "Christine deserved it" is not sufficient to plausibly allege ratification. Dkt. 53 at 11. At this stage of the proceedings, the Court disagrees. As the Court previously recognized, "Virginia courts typically find that ratification has occurred only where the employer has 'expressly' confirmed the conduct or acted affirmatively in response to it." Dkt. 31 at 18 (citing *Meade v. Johnston Mem'l Hosp.*, 2010 WL 3463639, at *6 (W.D. Va. Sept. 2, 2010)). Thus, the Court previously found that Plaintiff's allegations of ratification did not meet the "acted affirmatively standard." Here, by contrast, Plaintiff focuses on the other element of ratification:

---

[13] It may be, of course, that Red Hat through the course of discovery has evidence that permits it to argue that Rick Miller's statement could only have been made in relation to time-barred statements. Should that happen, Red Hat could appropriately renew their statute of limitations arguments. Moreover, Red Hat asserts that Rick Miller left Red Hat in October 2022 such that he *could not* have ratified Marcey's statements on behalf of Red Hat in or after December 2022. The Court, however, is confined to the allegations in the Second Amended Complaint, which must be taken as true at this stage of the proceedings. *See Dao*, 402 F. Supp. 3d at 315 (recognizing "the district court must 'accept as true all well-pled facts in the complaint and construe them in the light most favorable to [the plaintiff]'"); *see also Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 396 (4th Cir. 2006) (*per curiam*) ("Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment."). The Court notes again, however, that is Red Hat free to raise this issue at a later stage of the proceedings when the Court is not limited to the facts alleged in the Second Amended Complaint. Moreover, the Court reminds all counsel of their duties and responsibilities under Rule 11 of the Federal Rules of Civil Procedure. It would be concerning to the Court if counsel argued that Rick Miller ratified Marcey's statements in December 2022 while knowing that Rick Miller left Red Hat in October 2022.

express confirmation.  The statement "Christine deserved it" is tantamount to agreeing that Marcey could and should make his allegedly defamatory statements.  District courts in this Circuit have held that similar statements may constitute ratification.  *See Carter v. Dominion Energy, Inc.*, 529 F. Supp. 3d 525, 538 (W.D. Va. 2021) (finding ratification where person, when informed of alleged tort, laughed and said "Yeah, I know, you and [Beaver] are gone") (alteration in original).  Plaintiff has thus alleged that, when confronted by a partner/vendor of Red Hat regarding Marcey's statements in his capacity as an executive of Red Hat, Rick Miller essentially affirmed and agreed with Marcey's statements.  If this does not qualify as ratification in the context of defamation, the Court is not sure what would.  Red Hat's citation to the *Kincaid v. Anderson* case is not to the contrary.  The *Kincaid* case simply makes the unremarkable assertion that reacting to defamatory statements is not the same as endorsing the statement. *See* 2015 WL 3546066, at *4 n.9 (W.D. Va. June 8, 2015).  Here, however, Plaintiff has alleged that Rick Miller endorsed the statement. Accordingly, the Motion to Dismiss Count 2 will be denied in this regard.

In sum, the Motion to Dismiss is granted in part and denied in part with respect to Count 2.  The Motion is granted to the extent Plaintiff seeks to assert a theory of *respondeat superior* or to rely on time-barred statements.  The Motion is denied to the extent that Plaintiff seeks to raise a theory of ratification premised on the December 2022 statements and assuming that counsel has acted in good faith and in accordance with their Rule 11 obligations in alleging that Rick Miller was an employee of Red Hat capable of ratifying Marcey's statements.

## B. The Title VII and VHRA Claims

With respect to Plaintiff's Title VII and VHRA Claims,[14] Red Hat makes the following arguments: (i) the majority of Plaintiff's claims are time-barred; (ii) Plaintiff has failed to state a claim for a hostile work environment; (iii) Plaintiff has not alleged a wrongful discharge claim; and (iv) Plaintiff has failed to state a claim for retaliation. The Court will address each argument in turn.

### i. Whether the Title VII and VHRA Claims are Time-Barred

Title VII requires a claimant to file an EEOC charge of discrimination within 300 days of the alleged unlawful employment practice if the claimant initially instituted proceedings with a state or local agency. 42 U.S.C. § 2000e-5(e)(1). "If the statutory time period elapses between the allegedly discriminatory incident and the filing of the EEOC charge, the litigant is forever barred from Title VII relief." *Edwards v. Murphy-Brown, L.L.C.*, 760 F. Supp. 2d 607, 619 (E.D. Va. 2011). In the hostile work environment context, courts generally follow the "continuing violation doctrine" established by the Supreme Court of the United States in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002), where the Court determined that "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purpose of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." Applying *Morgan*, district judges in this District have made clear that:

> If acts outside the statutory window contribute to a hostile work environment, the Court may consider all of those acts, so long as any act contributing to that same hostile work environment occurs within the statutory window. Such a timely-act

---

[14] As this Court has frequently recognized, Title VII and VHRA claims are analyzed together "because Title VII and the VHRA use substantially identical language." *McCarty v. City of Alexandria*, 2024 WL 5081956, at *4 (E.D. Va. Dec. 11, 2024).

25

"anchors" the previous acts that occurred more than 300 days before the charge, making them also timely under the continuing violation doctrine.

*Edwards*, 760 F. Supp. 2d at 620. Like Title VII, the VHRA also has a 300-day lookback period. Va. Code Ann. § 2.2-3907.

Here, Plaintiff filed her Charge for purposes of both Title VII and the VHRA on May 11, 2023. Thus, the applicable 300-day lookback extends back to July 14, 2022. *See* Dkt. 53 at 18 (asserting that the lookback period is July 14, 2022); Dkt. 59 at 21 (agreeing that the lookback period is July 14, 2022). Thus, discrete claims of discrimination or retaliation must have occurred on or after July 14, 2022. With respect to the hostile work environment claims, acts outside of that 300-day window may be considered so long as there are also within time-period anchors.

The Court's analysis will begin with the discrete claims of discrimination and retaliation. To begin with, the Court notes that the Second Amended Complaint is not a model of clarity regarding what discrete acts of discrimination Plaintiff is asserting as paragraph 133 includes a list of approximately 25 "[a]cts of discrimination." Dkt. 32-1 at 30. In her Opposition Brief, however, Plaintiff clarifies that Counts 3 (Title VII) and Count 5 (VHRA) "assert two employment discrimination claims: [(1) that Plaintiff] was discharged based on sex . . . and [(2) that Plaintiff] was subjected to a hostile work environment based on sex." Dkt. 59 at 20.[15] The Court accepts Plaintiff's limitation on the claims that she is asserting and it will be binding on Plaintiff moving forward.[16] To the extent the Second Amended Complaint raises a discrimination claim based on

---

[15] Plaintiff's proffered limitation is a sensible one, as many of the other identified "acts of discrimination" are outside the lookback period or would not constitute adverse employment actions sufficient to support a sex discrimination claim.

[16] In other words, so long as the Second Amended Complaint is the operative complaint, Plaintiff will be bound by her concession that the only claims raised in Counts 3 and 5 are the wrongful discharge and hostile work environment claims. The Court will therefore not consider

the termination of Plaintiff's employment, Plaintiff alleges that the decision was made in December 2022 and her last day was in February 2023 – both within the lookback period. Accordingly, this claim is timely.

With respect to Plaintiff's retaliation claims, again, Plaintiff's Second Amended Complaint is again not a model of clarity as paragraph 144 lists approximately eighteen allegedly retaliatory acts. Dkt. 32-1 at ¶ 144. As with the discrimination claims, however, Plaintiff's Opposition Brief clarifies that her discrete claims of retaliation are limited to: (i) the failure to promote Plaintiff in September/October 2022; (ii) the termination of Plaintiff's employment in December 2022; (iii) the failure to place Plaintiff is a lesser position in January 2023; and (iv) the cancellation of a business trip in January 2023. Dkt. 59 at 23. Again, the Court accepts Plaintiff's limitation on her own complaint.[17] Based on the limitations that Plaintiff has proffered with respect to the alleged acts of retaliation, the four alleged retaliatory acts all occurred within the 300-day lookback period and are therefore timely.

With respect to Plaintiff's hostile work environment claims, Plaintiff has alleged a series of actions within the 300-day look back period which she asserts support her hostile work environment claims. Dkt. 32-1 ¶¶ 88-99. Thus, the hostile work environment claim itself is timely, and the Court may consider the out-of-time allegations of a hostile work environment to the extent that they "are adequately linked." *Mustafa v. Iancu*, 313 F. Supp. 3d 684, 693 (E.D. Va. 2018).

---

the other alleged "acts of discrimination" as attempting to set assert discrete acts of discrimination, but as support for the hostile work environment claim.

[17] Plaintiff's limitation on her retaliation claims also makes sense, as several of the alleged retaliatory acts are clearly outside of 300-day lookback period or are not sufficient to support a plausible retaliation claim on their own. *See* Dkt. 32-1 ¶ 144 (alleging that Plaintiff was not permitted to speak at a January 2022 conference or that Plaintiff was made uncomfortable at a November 2021 retirement party). Again, the Court will hold Plaintiff to construction of her Second Amended Complaint that she proffered.

In the end, each of Plaintiff's Title VII and VHRA claims (as limited by Plaintiff) fall within the 300-day lookback period.[18]

ii.  Whether Plaintiff has stated a Hostile Work Environment Claim

To state a hostile work environment claim, Plaintiff must allege sufficient facts to show that the alleged conduct she experienced was: (1) unwelcome; (2) based on a protected characteristic; (3) sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive work environment; and (4) imputable to her employer. *Pryor v. United Air Lines, Inc.*, 791 F.3d 488, 495-96 (4th Cir. 2015). Stated differently, a plaintiff must plausibly plead that

---

[18] In its Reply, Red Hat argues that Plaintiff did not properly exhaust her administrative remedies with respect to her hostile work environment claim because the hostile work environment claim does not refer to the specific July and December 2022 alleged defamatory statements. Dkt. 61. Because this was raised for the first time in Reply, Plaintiff did not have the opportunity to respond. Nonetheless, the Court has considered this argument and finds it unpersuasive. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002). As the Fourth Circuit has held, "[i]f a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000). Thus, district courts within the Fourth Circuit, including this Court, recognize that a plaintiff alleging a hostile work environment "need not exhaust *every* aspect of her hostile work environment claim." *McCarty v. City of Alexandria*, 2024 WL 5081956, at *8 (E.D. Va. Dec. 11, 2024); *Faulkenberry v. U.S. Dep't of Defense*, 670 F. Supp. 3d 234, 253 (D. Md. 2023) (agreeing with the plaintiff that a plaintiff need not "raise each fact that comprised her hostile work environment during the administrative process" where they are "reasonably related to those in Plaintiff's EEO charge"). Here, the Charge asserted that Marcey made statements calling her a "slut," "whore," and "cunt," threatened her family, and accused her of sleeping with various vendors. Dkt. 61-1. The Charge also asserted that "Marcey's conduct continued to be unaddressed by HR." *Id.* The July 2022 and December 2022 statements alleged in the Second Amended Complaint involve exactly the same allegations of sex-based defamatory statements by Marcey. Thus, they are reasonably related to the Charge and are appropriately exhausted. This is not a case like *Chacko v. Patuxent Institute*, 429 F.3d 505 (4th Cir. 2005) where the allegations in the complaint allege a different kind of harassment than that alleged in the Charge. Rather, the Second Amended Complaint merely specifies the dates on which the harassment "continued" as noted in the Charge.

"the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citation and internal quotation marks omitted). There is no precise formula for determining whether a work environment is "abusive" or "hostile"; such a determination can be made "only by looking at all the circumstances." *Id.* at 23.

Red Hat makes two arguments in support of dismissing the hostile work environment claims. To begin with, Red Hat asserts that Plaintiff failed to allege that anyone in management knew of the alleged hostile work environment. Dkt. 53 at 20-21. This argument is easily rejected. Plaintiff specifically alleges that in July 2022 executives, HR, and the Legal Department at Red Hat knew of Marcey's behavior. Dkt. 32-1 ¶ 89 (alleging Mike Miller was informed of Marcey's behavior), ¶ 90 (alleging that "[Plaintiff] again reported Mr. Marcey's behavior and conduct, including the kickback scheme, to HR and Legal"), ¶ 90 (alleging that Legal reacted to Plaintiff's allegations of harassment by asking Plaintiff questions regarding Marcey's statements). Furthermore, Plaintiff alleges that the allegations were repeated to her by a Red Hat Executive, demonstrating that he was aware of them. *Id.* ¶ 97 (Mike Miller told Plaintiff "You're the one who 'slept her way to the top'"). Thus, Plaintiff has adequately alleged that she complained to Red Hat about the circumstances surrounding her alleged hostile work environment.

Next Defendant focusses on whether Plaintiff's allegations plausibly allege a hostile work environment that was "severe or pervasive." Here, in this Court's view, both parties oversimplify the issues raised by Plaintiff's allegations of a hostile work environment. Indeed, the Court notes

that the hostile work environment claim is a very close question.[19]  Initially, the Court must clarify what allegations in the Second Amended Complaint truly appear related to Plaintiff's sex.  The Second Amended Complaint contains a broad swath of allegations where there is nothing to connect them to Plaintiff's sex other than Plaintiff's conclusory allegations.[20]  Similarly, the allegation that the Legal Department asked questions regarding whether Marcey's statements were true does not evince any sex-based animus; rather, it is the function of a Legal Department to investigate allegations of misconduct.  Dkt. 32-1 ¶ 90.  Thus, the thrust of the hostile work environment claim comes down to Marcey's statements and Red Hat's reaction (or lack of reaction to them).

Reading the facts in the Second Amended Complaint in the light most favorable to Plaintiff, she has essentially alleged that Marcey – a Red Hat executive – went on a months-long, continuous smear campaign whereby he sought to undermine Plaintiff's position in the workplace by using vile, sex-based accusations that she was a slut, a whore, and a person who had slept her way to the top, including by sleeping with specific individuals.  Dkt. 32-1 ¶ 62 (calling Plaintiff a "slut"), ¶ 64 (calling Plaintiff a "slut" and "whore"), ¶ 72 (accusing Plaintiff of having sexual relationships with men in the industry), ¶ 73 (calling Plaintiff a "fucking whore," "slut," and "cunt"); ¶ 77 (calling Plaintiff a "slut" and "whore"), ¶ 78 (calling Plaintiff a "whore" and asserting she "slept her way to the top"); ¶ 79 (same), ¶ 80 (same comments made in December 2022), ¶ 88 (same comments made in July 2022), ¶ 91 (alleging comments continued to be made in August 2022).  In addition to the sexualized language that Marcey is alleged to have used, Plaintiff also alleges that Marcey

---

[19] The Court's analysis here was made more difficult by the fact that the Second Amended Complaint does not make clear the structure or hierarchy of positions within Red Hat.

[20] *See* Dkt. 32-1 ¶¶ 28, 30, 32, 41, 52-53 (no factual allegations other Plaintiff's conclusory assertion connecting conduct to her sex).

made threats to "off" her family and the family members of those with whom she was allegedly engaged in a sexual relationship. *Id.* ¶¶ 66, 73, 77. Moreover, Plaintiff alleges that other executives at Red Hat adopted those allegations. *Id.* ¶ 97 ("You're the one who 'slept her way to the top.'"), ¶ 99 (Rick Miller stating "Christine deserved it" in reference to Marcey's actions and statements). Reading all of the inferences in Plaintiff's favor, Rick Miller's conduct can be inferred to be sex motivated, because he believed Plaintiff deserved Marcey's sex-based comments. *Id.* ¶ 48 (stating in October 2021 that he would not work with Plaintiff), ¶ 65 (excluding Plaintiff from a work event and refusing to let Red Hat pay for Plaintiff's clients drinks at the event), ¶ 71 (suggesting that Plaintiff was "playing with fire" and directing her not to "push Bruce's buttons"), ¶ 76 (removing Plaintiff's name plaque and belongings from her office and writing "New Hire" there).

At the motion to dismiss stage, this is sufficient to satisfy the severe or pervasive prong of a hostile work environment claim. *See Hammel v. Marsh USA Inc.*, 206 F. Supp. 3d 216, 239 (D.D.C. 2016) (permitting a hostile work environment claim based on allegations that allegations that amounted to a "campaign to undermine" the plaintiff's "integrity, work ethic and intelligence"); *Gilliard v. Gruenberg*, 302 F. Supp. 3d 257, 281 (D.D.C. 2018) (permitting hostile work environment claim where individual emailed the plaintiff's clients to undermine her and holding, "[w]hile many of [the plaintiff's] allegations are not particularly severe, the breadth and scope of her allegations convinces the Court that the alleged discriminatory conduct was sufficiently pervasive"). The allegations at issue in the Second Amended Complaint are the kind of "highly personalized comments designed to demean and humiliate." *EEOC v. Fairbrook Med. Clinic, PA*, 609 F.3d 320, 328 (4th Cir. 2010) (reversing district court's grant of summary judgment on hostile work environment claim). Indeed, it appears to the Court that Marcey's

alleged statements were designed to undermine Plaintiff's position within Red Hat and within the industry at large—for there is generally no easier way to undermine a woman's status in the workplace than to allege that she obtained that status by sleeping with a man.[21]  Thus, although a close question, the Court will deny Red Hat's Motion to Dismiss with respect to the hostile work environment claim.

  iii.  Whether Plaintiff has stated a Claim for Discriminatory Discharge

  It is well settled that to state a plausible claim for discriminatory discharge, a plaintiff must allege that: (i) she belongs to a protected class; (ii) she suffered an adverse employment action; (iii) at the time of the adverse employment action, she was performing her job at a level that met her employer's legitimate expectations; and (iv) she suffered the adverse employment action under circumstances giving rise to an inference of unlawful discrimination.  *Weatherford v. Salvation*

---

  [21] The circumstances of this case are somewhat unusual as it appears that all of Marcey's statements were made at work-related events (meetings with partners/vendors and conferences) but not necessarily "in the workplace."  The parties did not discuss this issue, and it is not a basis for the Court's ruling here, but some courts have recognized that "harassment does not have to take place within the physical confines of the workplace to be actionable; it need only have consequences in the workplace."  *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008).

  Another unusual circumstance, which Red Hat only noted in its Reply and thereby precluded Plaintiff from responding, is that, for the most part, Marcey did not make the harassing statements *to* Plaintiff; rather, he made the statements to partners/vendors who relayed the harassing messages.  Dkt. 61 at 15; *In re Volkswagen AG*, 2024 WL 646344, at *2 (E.D. Va. Feb. 15, 2024) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered."). Although this circumstance may raise issues of proof and hearsay at later stages of the proceedings, courts have recognized that, ultimately, "[t]here may be a higher bar for a claimant to show a hostile work environment based on statements made outside of her presence, but 'comments made to others are . . . relevant to determining whether [plaintiff] was subjected to severe or pervasive . . . harassment."  *Amare v. Lazer Spot, Inc.*, 2024 WL 2092983, at *6 (W.D. Va. May 9, 2024).

*Army*, 2023 WL 141421, at *2 (W.D. Va. Jan. 10, 2023) (citations omitted).  Here, the parties

focus primarily on the fourth element.[22]

Defendant argues that Plaintiff cannot show that she was discriminated against because her

position was eliminated.  Although the Second Amended Complaint is far from clear, it appears

that Plaintiff's position at the time her position was eliminated was "Senior Director" of Partner

Ecosystem Sales.  Dkt. 32-1 ¶ 96 (alleging that Plaintiff applied for a "lesser position of Director,

Partner Ecosystem Sales, in the department where she had held the position of ***Senior*** Director"

(emphasis in original)).  Plaintiff asserts that her position "as Senior Director of PSE NAPS had

been eliminated, effective February 13, 2023."  *Id.* ¶ 95.  Plaintiff then alleges that, after her

position was eliminated, "Garrett Goldstein . . . announc[ed] his hiring as the new Partner Sales

Ecosystem Sales Director for Public Sector for Red Hat – Ms. Cox's exact position."  *Id.* ¶ 98.[23]

But Plaintiff's own allegations contradict her conclusion that Goldstein was hired for her exact

position, because Plaintiff herself alleges that she was a "Senior Director," and that Director was

a "lesser position."  *Id.* ¶¶ 95-96; *see Freire v. Keystone Title Settlement Servs., Inc.*, 2009 WL

5217033, at *6 (D. Md. Dec. 30, 2009) *aff'd* 389 F. App'x 306 (4th Cir. 2010) ("Because the

position was eliminated, Freire cannot make out a prima facie case of prohibited discrimination

under the *McDonnel Douglas* framework based on her termination.").  Plaintiff does not allege

---

[22] Although Red Hat correctly notes that Plaintiff did not use the phrase "wrongful discharge" in the Second Amended Complaint, Plaintiff clearly alleges that one of the "acts of discrimination" perpetrated by Red Hat was "'eliminating' [Plaintiff's] position and then filling it with a male – Garrett Goldstein." Dkt. 32-1 ¶¶ 133, 151.

[23] Red Hat suggests that the Court should take judicial notice of Goldstein's LinkedIn page for his actual position. The Court cannot. *See Ibey v. Taco Bell Corp.*, 2012 WL 2401972, at *1 (S.D. Cal. June 18, 2012) ("LinkedIn is not a source whose accuracy cannot be reasonably questioned.").

that any other person was hired for her Senior Director position and as such there are no allegations
to contradict her concession that her position was eliminated.

Plaintiff's other arguments for inferring discrimination based on the elimination of her
position in December 2022 are similarly unpersuasive. Plaintiff argues that the Court should infer
discrimination because, in March/April 2022, Rick Miller the Senior Director of Federal Civil
Sales removed Plaintiff's belongings from her office and wrote "New Hire" on her door which
Plaintiff construes as "constructive discharge-type actions against her." Dkt. 59 at 26 (citing Dkt.
32-1 ¶ 76).[24] Although Rick Miller (who also made the "Christine deserved it" comment) could
be considered motivated by sex-based animus, Plaintiff does not allege that Rick Miller had
anything to do with the elimination of Plaintiff's position. Based on the allegations in the Second
Amended Complaint, Plaintiff and Rick Miller were both "Senior Directors." Dkt. 32-1 ¶¶ 38, 95
(alleging that Rick Miller is Senior Director of Federal Civil Sales and Plaintiff is Senior Director
of PSE NAPS). Accordingly, it is unclear how Rick Miller would have the authority to discharge
Plaintiff.[25] Moreover, Plaintiff has not alleged that Rick Miller made the decision to eliminate
Plaintiff's position and she has alleged that the decision was communicated to Plaintiff by Chris
Smith, Vice President and General Manager of NAPs, about whom Plaintiff has made no
allegations from which the Court could infer sex-based animus. Thus, the Court has no basis on

---

[24] Although the Court certainly does not condone the alleged actions of Rick Miller, if
proven to be true, those incidents do not meet the high bar necessary to establish a constructive
discharge. *See High v. Wells Fargo Bank*, 2023 WL 2505540, at *11 (E.D. Va. Mar. 14, 2023)
(recognizing that "the intolerability standard governing constructive discharge claims is more
stringent than the severe and pervasive standard for hostile work environment claims" (internal
quotations and citations omitted)).

[25] The Court again notes that in future dispositive motions it would be helpful to understand
the organization and hierarchy within Red Hat.

which to find that Plaintiff's position was eliminated under circumstances giving rise to an inference of discrimination and the Court will grant the Motion to Dismiss in this regard.[26]

### iii.  Whether Plaintiff has stated a Claim for Retaliation

To state a *prima facie* retaliation claim under Title VII or the VHRA, Plaintiff must sufficiently allege "(1) that [she] engaged in protected activity, (2) that the employer took a materially adverse action against [her] and (3) there is a causal connection between the protected activity and the adverse action." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 195 (4th Cir. 2019) (internal citations omitted).  To allege a "materially adverse action," Plaintiff must allege that her employer took actions that may dissuade a reasonable employee from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  To establish causation, Plaintiff must allege facts sufficient to reasonably infer that her protected activity was the "but-for" cause of an alleged adverse action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under [Section] 2000e–3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").  Red Hat primarily focuses on whether Plaintiff has adequately alleged causation here.

To begin with, the only "materially adverse actions" that Plaintiff discusses in her Opposition are: (i) a failure to promote (in September/October 2022); (ii) the elimination of her position (in December 2022); (iii) the failure to hire Plaintiff into a lesser position (in January

---

[26] The Court does not analyze whether Plaintiff has asserted a discriminatory failure to hire claim, because Plaintiff has disclaimed that she is bringing such a claim.  *See* Dkt. 59 at 20 ("Counts Three and Five assert two employment discrimination claims: [Plaintiff] was discharged based on sex . . . and was subjected to a hostile work environment based on sex . . . .").  In any event, on the facts alleged, it does not appear that Plaintiff would be successful if she attempted to assert such a claim.

2023); and (iv) the cancellation of her trip to a conference (in January 2023).  Dkt. 59 at 23.  The Court must next review when Plaintiff engaged in protected activities: (i) on July 20, 2021; (ii) in October 2021; (iii) on March 29, 2022; and (iv) July 2022.[27]  Dkt. 32-1 ¶¶ 42, 45, 68, 90.  While there is no bright-line rule for how closely an adverse action must follow a protected activity for causation purposes, the Fourth Circuit has consistently held that periods over a few months are insufficient to infer causation.  *See, e.g.*, *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (noting that a two month temporal gap "is sufficiently long so as to weaken significantly the inference of causation between the two events"); *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (affirming dismissal of retaliation claim where "there was a least a two-month temporal gap between" the plaintiff's protected activity and the alleged retaliatory conduct); *Roberts v. Glenn Industrial Grp.*, 998 F.3d 111, 127 (4th Cir. 2021) ("Although there is no 'bright-line rule' for temporal proximity, courts within our Circuit have found that shorter lapses of time similar to the three-month period at issue in the case before us are insufficient to infer a causal relationship without other evidence of a causal link.").  Here, with the exception of the alleged failure to promote claim, each of Plaintiff's alleged material adverse actions came more than three months after her last alleged protected activity.  Plaintiff last protected activity was July 2022, which means: (i) the elimination of her position came five months later; and (ii) the failure

---

[27] Red Hat argues that the March and July 2022 meetings with the HR and the Legal Department do not constitute protected activities for purposes of Title VII or the VHRA.  Dkt. 61 at 18.  This argument is unpersuasive.  Plaintiff alleges that those meetings were to address her concerns regarding "Marcey's inappropriate and unprofessional treatment of her." Dkt. 32-1 ¶ 68. This is sufficient to allege that she engaged in protected activity.  Red Hat's argument that Plaintiff failed to specifically allege that she "complained" is a level of nit-picking not required or encouraged by Rule 8 or Rule 12(b)(6).

to hire her for the lesser position and the cancellation of her conference trip came six months later. This temporal gap is sufficient to break any alleged causal connection between these events.

Plaintiff's allegations regarding an alleged retaliatory failure to promote could conceivably establish a causal connection given the ambiguities in Plaintiff's pleading regarding dates. Namely, if her meeting with HR occurred at the end of July and the failure to hire occurred in early September, then the temporal proximity could be less than two months.  Dkt. 32-1 ¶¶ 90, 93. Nonetheless, Plaintiff's "failure to promote" retaliation claim fails on two other grounds.  First, Plaintiff has failed to plead a plausible retaliation claim based on failure to promote, because Plaintiff alleges that "Red Hat . . . decided not to hire anyone for that position." *Id.* ¶ 93; *see Agelli v. Sebelius*, 2014 WL 347630, at *5 (D. Md. Jan. 30, 2014) (collecting cases recognizing that a plaintiff cannot establish a *prima facie* case where an employer cancels a vacancy and does not fill the position).[28]  Additionally, Plaintiff has not established that the decision-maker with respect to the failure to promote claim had knowledge of her protected activities.  *See Roberts v. Glenn Industrial Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021) ("[W]e conclude that Fourth Circuit precedent addressing the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity."); *Jones v. HCA*, 16 F. Supp. 3d 622 (E.D. Va. 2014) (explaining that "the decisionmaker's knowledge of the protected activity is 'essential to a retaliation claim'" (quoting *Francisco v. Verizon S. Inc.*, 756 F. Supp. 2d 705, 725-26 (E.D. Va. 2010))).  Here, Plaintiff has only alleged that persons involved in HR and Legal had knowledge of Plaintiff's July 2022 protected activities.  Dkt. 32-1 ¶ 90.  Plaintiff does not include any allegations regarding who

---

[28] *See also Culley v. Trak Microwave Corp.*, 117 F. Supp. 2d 1317 (M.D. Fla. 2000) ("Because Trak did not hire anyone for the Ferrite Engineer position, Culley cannot establish that Trak's failure to hire *him* constitutes an adverse employment action . . . .") (emphasis in original).

decided not to promote her in September/October 2022 nor any allegations that such person(s) knew of her protected activities.  *Id.* ¶ 93.[29]  Accordingly, Plaintiff has failed to state a claim for retaliation.[30]

## C. The IIED Claims

Finally, Defendants both seek to dismiss Plaintiff's IIED claims in Counts 7 and 8.  "To establish a claim for [IIED], a plaintiff must plead that: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the wrongdoer's conduct and the resulting emotional distress; and (4) the resulting emotional distress was severe."  *Nixon v. Kysela Pere Et Fils, Ltd.*, 2021 WL 1996063, at *6 (W.D. Va. May 18, 2021) (citing *Almy v. Grisham*, 639 S.E.2d 182, 186 (Va. 2007)).  IIED is generally disfavored in the law.  *See id.* (citing *Almy*, 639 S.E.2d at 187).  Moreover, to state a claim, Plaintiff must specifically plead that a defendant acted for "the specific purpose of inflicting emotional distress upon [the plaintiff] or that [the defendant] intended [his] specific conduct and knew or should have known that emotional distress would likely result."  *Bezu v. Bank of Am.*,

---

[29] Plaintiff has likewise not alleged who the decision-makers were with respect to the other claimed retaliatory actions or that such persons had knowledge of her protected activities.  *See* Dkt. 29-1 ¶ 95 (failing to allege decision-maker with respect to elimination of position or knowledge of protected activities), ¶ 96 (failing to allege decision-maker with respect to lesser position or knowledge of protected activities), ¶ 97 (failing to allege decision-maker with respect to conference or knowledge of protected activities).

[30] To the extent Plaintiff's Opposition attempts to suggest (but does not argue) any retaliatory constructive discharge on continuing retaliation theory, such suggestion fails to persuade.  As discussed *supra*, Plaintiff's allegations do not meet the high bar for a constructive discharge.  Moreover, to the extent Plaintiff attempts to suggest a continuing retaliatory animus, that too fails because: (i) many of Plaintiff's alleged acts of retaliation do not constitute material adverse actions; (ii) the alleged pattern of retaliation is too attenuated; and (iii) Plaintiff has not alleged facts establishing that the persons alleged to have engaged in retaliation against her had knowledge of her protected activities.

*N.A.*, 146 F. Supp. 3d 787, 793 (E.D. Va. 2015).  Because Plaintiff's theory of IIED against Red Hat is premised on her claim against Marcey, the Court will first analyze Count 7 before turning to Count 8.

i.  Whether Plaintiff has stated a claim for IIED against Marcey

Plaintiff's IIED claim rests on the same statements and activities by Marcey that support her defamation claims.  The Fourth Circuit and district courts within the Fourth Circuit have rejected similar claims as insufficient to support an IIED claim.  *See, e.g.*, *Webb v. Baxter Healthcare Corp.*, 1995 WL 352485, at *5–6 (4th Cir. Jan. 30, 1995) (concluding that plaintiff's allegations that she was repeatedly ridiculed based on her sex and ethnicity, including the comment such as "You Jews are all alike," were insufficient to state a claim for IIED under Virginia law); *Coles v. Carilion Clinic*, 894 F. Supp. 2d 783, 796–97 (W.D. Va. 2012) (granting a motion to dismiss plaintiff's IIED claim that was premised on defendant's use of "racially abusive language and symbols and . . . persistence in refusing to promote [the plaintiff] while electing to promote while males instead"); *White v. Ocean Duchess, Inc.*, 2007 WL 4874709, at *5–6 (E.D. Va. Nov. 7, 2007) (finding that "[p]laintiffs' allegations of racial slurs and termination based on race fall woefully short of meeting the requisite level of outrageous conduct necessary to state a claim for [IIED]").  Importantly, in the *Webb* case, the Fourth Circuit affirmed the dismissal of a Virginia IIED claim, even though it reversed the district court's grant of summary judgment in favor of the defendant on a related hostile work environment claim.  *Webb*, 1995 WL 352385, at *6.  So too here, the behavior Plaintiff is alleged to have endured "violates contemporary standards of appropriate behavior in the workplace, but the court cannot conclude that these comments are an atrocity or utterly intolerable in a civilized society."  *Brown v. AECOM, Inc.*, 2022 WL 263551, at * 5 (W.D. Va. Jan. 27, 2022).

Plaintiff seeks to avoid this conclusion by citing to other cases from within this Circuit. Notably, Plaintiff cites to *Jackson v. Kimel*, 992 F.2d 1318 (4th Cir. 1993). That case, however, was not decided under Virginia law. 992 F.2d at 1323 (analyzing "intentional infliction of emotional distress under North Carolina law"). Plaintiff's citation to *Steele v. Goodman*, 382 F. Supp. 3d 403 (E.D. Va. 2019) also fails to persuade. In that case, the defendant called the plaintiff a "con man" and a "fraud." *Id.* at 421. There, the defendant's only arguments were that, because the plaintiff's defamation claim should fail, the IIED claim should also fail, and that the Plaintiff had not sufficiently alleged emotional distress. *Id.* at 425. Without further analysis of the outrageousness of the conduct, the *Steele* Court found that, because "the defamation claim may proceed, this argument cannot prevail." *Id.* Here, Marcey's arguments are not premised solely on the alleged failure to state a claim for defamation. Plaintiff's citation to *Tye v. Costco Wholesale*, 2005 WL 1667597 (E.D. Va. June 14, 2005) is also unpersuasive as the primary argument by defendant there was a lack of severe emotional distress. *Id.* at *6. Moreover, there is little discussion of the facts there, such that the Court cannot analyze whether there are any factual similarities that would make the discussion there helpful here. Finally, Plaintiff's citation to *Young v. Sheetz, Inc.*, 987 F. Supp. 496 (W.D. Va. 1997) is unpersuasive as the facts of that case are clearly outrageous and well beyond the conduct alleged here. *Id.* at 497-98 (discussing allegations that Plaintiff was the recipient of unwanted touching, and that the other employee would "stand by the pornographic magazine rack, stimulate himself, go into the men's room and masturbate, before forcing plaintiff to clean up the mess"). Rather, the circumstances of this case seem to align more clearly with the *Webb* case and those district court cases following *Webb* which have found a plausible hostile work environment claim but not an IIED claim.

As a judge in this District recognized, conduct can be "offensive, unacceptable, and wrongful" but still not meet the threshold for outrageousness, because the "outrageous and intolerable prong is seldom met by plaintiffs under Virginia law." *Dao v. Faustin*, 402 F. Supp. 3d 308, 320 (E.D. Va. 2019) (dismissing IIED claim based on forced hugs, but permitting Title VII hostile work environment claim). Accordingly, the Court will grant the Motion to Dismiss with respect to Count 7.

### ii. Whether Plaintiff has stated a Claim for IIED against Red Hat

Plaintiff's IIED claim against Red Hat is premised on Red Hat's ratification of the conduct discussed in her IIED claim against Marcey. Because the IIED claim against Marcey fails, the IIED claim against Red Hat also fails. Accordingly, the Court will dismiss Count 8.

### IV. CONCLUSION

In conclusion, each of the Motions to Dismiss will be granted in part and denied in part. Plaintiff has plausibly alleged defamation claims against Marcey based on the December 2022 statements. Moreover, Plaintiff has successfully amended her complaint to plausibly allege that Red Hat ratified Marcey's statements. Plaintiff has plausibly alleged a hostile work environment claim against Red Hat but has failed to state a claim for wrongful discharge or retaliation. Finally, Plaintiff has failed to state a claim for IIED against Marcey or Red Hat.[31]

Accordingly, it is hereby ORDERED that Red Hat's Motion to Dismiss (Dkt. 52) is GRANTED-IN-PART and DENIED-IN-PART; and it is

FURTHER ORDERED that Marcey's Motion to Dismiss (Dkt. 54) is GRANTED-IN-PART and DENIED-IN-PART; and it is

---

[31] This is now Plaintiff's third version of her complaint. To the extent the Court has dismissed any claims, the Court will not permit further amendment. It is time for this matter to proceed and move towards discovery.

FURTHER ORDERED that Counts 4, 6, 7, and 8 are DISMISSED in their entirety; and it is

FURTHER ORDERED that Counts 1 and 2 are DISMISSED-IN-PART only to the extent that the defamation claims rely on statements to unidentified vendors or partners, to the extent the claims rely on statements that the Court found to be time-barred, and to the extent that Count 2 relies on a *respondeat superior* theory of liability; and it is

FURTHER ORDERED that Counts 3 and 5 are DISMISSED-IN-PART only to the extent that they assert a discriminatory discharge claim.

It is SO ORDERED.

Alexandria, Virginia
March 21, 2025

_____ /s/
Rossie D. Alston, Jr.
United States District Judge